552 So.2d 407 (1989)
Mrs. Hattie Catherine Grace CLIFTON and Clarence Clay Clifton, Jr.
v.
Louise D. LINER, et al.
No. 88 CA 1078.
Court of Appeal of Louisiana, First Circuit.
October 11, 1989.
Concurring Opinion November 6, 1989.
*408 Morrow, Morrow, Ryan & Bassett, Stephen M. Morrow, James P. Ryan, Opelousas, for plaintiffs-appellants Hattie Catherine Grace Clifton and Clarence Clay Clifton, Jr.
Ottinger & Gates, Mark D. Sikes, Lafayette, for defendants-appellees Louise D. Liner, et al.
Before COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
WATKINS, Judge.
Plaintiffs filed a petitory action[1] against defendants to establish their ownership of a tract of land in Iberville Parish. Defendants answered plaintiffs' petition, alleging acquisitive prescription of ten or thirty years. The trial court sustained defendants' exception of thirty years acquisitive prescription. Plaintiffs-appellants seek review of this judgment as well as a subsequent judgment denying their motion for a new trial.[2] We affirm the judgment of the district court and append its reasons for judgment.
Plaintiffs-appellants in this cause are Hattie G. Clifton and Clarence Clay Clifton, Jr. Defendants-appellees are the heirs (universal successors) of E.A. Davis, namely Hazel Perkins, Ione Perkins, Maxie Perkins, Laura D. Samson, Lena D. Theriot, C.E. Castille, Billie D. Sutter, Geraldine D. Duhon, Winona Sampson Lorio, and George F. Maraist, Jr. In this petitory action filed on December 7, 1984, the plaintiffs sought legal recognition of their ownership of the following described property to which they hold record title:
All sections of Lots 73 and 74, T-7-S, (Township-Seven-South) R-8-e, (Range-Eight-East) S.E.D. of Louisiana, west of the Mississippi River lying between Bayou Des Ourse and the east fork of Bayou Alabama (Bayou Des Glaise) in Iberville Parish, Louisiana.
The disputed tract contains approximately 100 acres of mostly swampland and is located in the Atchafalaya Basin. The plaintiffs are the undisputed owners of Section 72 and the defendants are the undisputed owners of Section 75 and Sections 73 and 74 west of Bayou Des Ourse, all of which adjoin the disputed tract. The following diagram illustrates the situation.
*409 
TITLE
Both the plaintiffs and defendants claim title to the disputed tract which was involved in a parish boundary dispute from 1910 until 1947, when the Supreme Court ruled in favor of Iberville Parish in St. Martin Parish Police Jury v. Iberville Parish Police Jury, 212 La. 886, 33 So.2d 671 (1947). Apparently each parish considered the disputed tract to be within its boundary and accordingly assessed taxes and sold the property when such taxes were not paid.
Because of the boundary dispute, two lines of title emerged. The plaintiffs' title is traceable to land grants from the State of Louisiana and is a valid record title. In *410 1910, E.B. McCorkle (plaintiffs' ancestor in title) was the victor in a petitory suit against Charles Savoy (defendants' ancestor in title), in which the court recognized that the disputed property was located in Iberville Parish. Notwithstanding this decision, Charles Savoy sold, without warranty, all his right, title and interest in the property to George Knight and E.A. Davis on July 24, 1914, describing it as being in St. Martin Parish. On January 20, 1919, E.A. Davis sold all of his right, title and interest to George Knight and five days later George Knight sold whatever rights, titles and interest the late Charles Savoy has in and to the disputed property back to E.A. Davis. On August 8, 1931, E.A. Davis purchased the disputed tract from the Tax Collector in St. Martin Parish, and in 1943 E.A. Davis obtained a quitclaim for the property from the Board of Commissioners of the Atchafalaya Basin Levee District. All of the deeds held by E.A. Davis describe the property as being in St. Martin parish. The defendants are the universal legatees of E.A. Davis.

ACTS OF POSSESSION
Corporeal possession was begun in favor of the plaintiffs by their ancestor in title, Elodie Schlater, in 1891, with the act of cutting timber from the disputed tract. In 1938, another ancestor in title, W.L. Grace, executed a fifteen year hunting lease in favor of Wade Martin; no evidence was presented concerning any acts of possession pursuant to the hunting lease. The plaintiffs purchased the disputed property from W.L. Grace in 1948. Thereafter plaintiffs granted Dr. Robert Morrow permission to hunt the land beginning sometime between 1955 and 1960. Dr. Morrow testified that he hunted once a month during hunting season, but he added that everyone hunted the land without regard to its ownership until 1970 when the Sherburne Wildlife Association (SWA) was formed. On October 30, 1964, plaintiffs executed a right-of-way to Gulf States Utilities (GSU) pursuant to which GSU constructed a power line. On January 24, 1972, plaintiffs executed an oil, gas and mineral lease to Frank's Petroleum; no acts of possession were established with regard to this lease. On July 15, 1976, a three year hunting lease was executed between the plaintiffs and Patrick Morrow. Plaintiffs paid taxes on the disputed property in Iberville Parish from 1954 to 1978.
Corporeal acts of possession began in favor of the defendants by their ancestor-in-title, E.A. Davis. In 1931, E.A. Davis contracted with Esper Marionneaux to cut timber from the disputed tract as well as from his adjoining property. According to the recorded affidavit of Esper Marionneaux, these logging operations continued by contract with E.A. Davis in 1936, 1938, 1945, 1955. The testimony at trial reveals timber operations, or evidence thereof, in 1945, 1955, 1957 and 1965 or 1966. Another witness, Walter Lalonde, testified that Esper Marionneaux built a logging road through the disputed property in the 1950s. Mr. Lalonde described the road as being where the high-power line is now located and being generally known as the Marionneaux road. The testimony established that the high-power line runs directly through the disputed property.
Further timber operations were conducted by the defendants in 1973 and 1974, on all of sections 73, 74 and 75 pursuant to a stumpage sales contract with Marionneaux Lumber Company. In 1972, prior to executing the contract, defendants employed Jerome Summers, a forestry consultant, to cruise the disputed property and procure a purchaser for the timber. During his survey of the property Mr. Summers found a blazed line of trees approximately 100 feet east of the section line between Sections 72 and 73. Because the blaze marks were old and difficult to see, Mr. Jerome Summers reblazed them. Pursuant to his survey, Mr. Summers made a timber estimate and advertised the timber for sale. Mr. Summers also testified that he made a similar timber survey in 1965 or 1966, and that he never noticed a blazed line at that time. However, subsequent testing of the blaze marks indicated that some of the marks had been there as long as 50 years, and other marks indicated that they were in existence for 25 and 29 years. Anthony *411 Theriot testified that he saw the blazed line in 1958 and again in 1973 when Marionneaux Lumber Company was cutting timber. He testified that all the merchantable timber west of the blazed line was harvested. Esper Marionneaux also testified that he recalled using a blazed line as the boundary for timber cutting in 1973-74 on the disputed property. James Marionneaux also testified that the timber operations in 1973-74 consisted of all the land west of the blazed line to the section line between Sections 75 and 76. He testified that he did not recall seeing the blazed line prior to 1973.
Other acts of possession on behalf of the defendants include the assignment of Wade Martin's lease of the disputed property in 1943, and the execution of a flowage deed to the United States of America pursuant to which the disputed property, as well as the surrounding property, was flooded in 1973 and remained so for 30 to 40 days. Furthermore, in 1964, the defendants executed a servitude in favor of GSU. The defendants also executed a one year hunting lease in 1973, and a five year hunting lease in 1978, both to Lawrence Summers.
At trial several witnesses testified that the property was hunted without regard to ownership and that this continued from the 1940s until 1970 when the Sherburne Wildlife Association (SWA) was formed. This organization leased property for its members to hunt. However, Walter Lalonde, a former SWA officer, testified that the SWA never leased the disputed property. He stated that they hunted the property with the permission of Mr. Lawrence Summers. Several witnesses also testified that in 1978, Mr. Summers told them that they could no longer hunt the disputed property.
Defendants and their ancestor in title paid taxes on the property from 1931 to 1948 in St. Martin Parish, and from 1949 until 1982 in Iberville Parish.
Based on these facts the trial court maintained the defendants' exception of thirty years acquisitive prescription. Appellants assert trial court error in maintaining appellees' exception of thirty years acquisitive prescription based upon three different theories: (1) Appellants' acts and the acts of their ancestors-in-title establish a usurpation of appellees' possession sufficient to interrupt the running of any acquisitive prescription. (2) Appellees' acts of possession are insufficient to establish thirty years acquisitive prescription in that they were not unequivocal and continuous, nor did they give notice to the record owners that they were possessing as owners. (3) Appellees' acts of possession were under bad faith title, precluding constructive possession and requiring them to make out their actual possession inch-by-inch or within visible boundaries.[3]
Before an appellate court can disturb a factual finding of the trial court, it must determine that the finding is manifestly erroneous and has no factual basis. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Manifest error has been defined as a finding of fact which is not reasonably supported by credible evidence in the record. Dyson v. Gulf Modular, 338 So.2d 1385 (La.1976).

PRESCRIPTION OF THIRTY YEARS
Under the civil code articles dealing with thirty years acquisitive prescription, ownership of immovable property may be acquired without title or without good faith when a party or his ancestors in title have corporeally possessed it for thirty years, or commenced corporeal possession of it and thereafter sustained civil possession thereof. *412 See LSA-C.C. art. 3499, (amended and reenacted, Acts 1982, No. 187 § 1, see LSA-C.C. art. 3486).[4] The possession must be continuous and uninterrupted during the whole time, and must be public, unequivocal and with the intent to possess as owner. LSA-C.C. art. 3500, (see now LSA-C.C. art. 3435). What constitutes corporeal possession is a question of fact, and each case rests upon its own individual circumstances. Plaisance v. Collins, 365 So.2d 608 (La.App. 1st Cir.1978).
The acts which must be shown to establish possession are governed to a large extent by the use to which the land is destined or for which it is suitable. Id.; see also Johnson v. La Bokay Corporation, 326 So.2d 589 (La.App. 3d Cir.1976).
When a party possesses part of an immovable by virtue of a title, he constructively possesses to the limits of his title. LSA-C.C. art. 3437, (see now LSA-C.C. art. 3426); Winjum v. Duplantis, 393 So.2d 405 (La.App. 1st Cir.1980). However, he cannot depend on constructive possession to defeat adverse corporeal possession by another for a sufficient period of time to establish prescriptive title. Whitley v. Texaco, 434 So.2d 96 (La.App. 5th Cir.), writ denied, 435 So.2d 445 (La.1983). This follows from the rule that property cannot be legally possessed by adverse parties simultaneously, and constructive possession cannot prevail over adverse corporeal possession. Tenneco Oil Co. v. Pitre, 496 So.2d 502 (La.App. 1st Cir.), writ denied, 497 So.2d 1388 (La.1986).
Where one party has established constructive possession of land through previous corporeal possession, followed by civil possession, he can only be ousted by a counter actual possession of one year. Considering the nature of the property as being mostly swamp land, the defendants' acts of possession, including timber cutting, mineral leases, a flowage deed, paying taxes, reblazing tree lines, and hunting, show actual corporeal possession for more than a year over all of the disputed property. Although the plaintiffs were in constructive possession of the land prior to 1931, we find that the acts of possession established by the defendants support the trial court's conclusion that the plaintiffs' possession was ousted. The evidence further supports the finding that the defendants' acts of possession were continuous, uninterrupted, public, and unequivocal and were performed with the intent to possess as owner.
"[O]ne who has acquired corporeal possession continues in possession until he transfers it or abandons it, or until another expels him from it, or until he allows the land to be usurped and held for a year without doing any act of possession or without interfering with the usurper's possession." Plaisance, 365 So.2d at 614. See also LSA-C.C. art. 3449, (now LSA-C.C. art. 3433). Numerous disturbances may occur without interrupting possession of the land. A disturbance does not deprive a person of his dominion and control over property if it merely interferes with his right to possession or throws an obstacle in the way of his enjoyment of possession. Id.
The acts of possession upon which plaintiffs rely in establishing adverse corporeal possession sufficient to interrupt defendants' possession were not unequivocal nor were they continuous. Although there is testimony in the record regarding various acts of possession on behalf of the plaintiffs, the acts consisted primarily of paying taxes and issuing hunting leases to relatives, one of whom testified that the disputed property as well as the surrounding property was hunted by numerous persons without regard to ownership. Furthermore, the plaintiff, Clarence Clay Clifton, Jr., admitted that he had never even seen the disputed property.
We therefore find that the acts of possession performed by the plaintiffs, after the defendants began corporeal possession, were merely disturbances which in no way *413 interfered with the defendants' right to possess or their right to enjoy their possession.

EXTENT OF POSSESSION
With regard to appellants' assignment of error concerning the extent of property defendant obtained through thirty years prescription, we find the trial court judgment unclear. The trial court merely maintained the plea of thirty years acquisitive prescription without discussion of the extent of the possession. The appellants contend that appellees do not have title to the property sufficient to avail themselves of any type of constructive possession, and therefore they must make out their actual possession inch-by-inch or within visible boundaries.
All the rules governing prescription of ten years (good faith possession) are applicable to prescription of thirty years (bad faith possession), except those which are contrary or incompatible. LSA-C.C. art. 3505, (now LSA-C.C. art. 3488). In the case of thirty year prescription founded upon just title, the possessor's good faith is not a consideration. LSA-C.C. art. 3475, (now LSA-C.C. art. 3486). Rather, the possessor must show only just title and thirty years possession. The advantage of thirty years acquisitive prescription under just title as opposed to possession without title is that the possessor may avail himself of the rule of constructive possession. Ordinarily the title conferred by acquisitive prescription extends only to that property which has actually been possessed. However, when one possesses under just title, possession of part of an immovable under such title is deemed to be constructive possession to the limits of the title. Former LSA-C.C. art. 3498,[5] (now LSA-C.C. art. 3426) and LSA-C.C. art. 3503,[6] (now LSA-C.C. art. 3487). See also comments to present LSA-C.C. arts. 3426; LSA-C.C. art. 3487 and LSA-C.C. art. 3483, comment g; Succession of Burat v. Board of Levee Commissioners, 469 So.2d 1022 (La.App. 4th Cir.), writ denied, 475 So.2d 1095 (La. 1985); Johnson v. La Bokay, 326 So.2d 589; and Succession of Seals, 142 So.2d 629 (La.App. 2d Cir.1962), modified on other grounds, 243 La. 1056, 150 So.2d 13 (1963).[7]
A title is just for purposes of thirty years acquisitive prescription when the deed is regular in form, is valid on its face and would convey the property if executed by the owner. LSA-C.C. arts. 3483-3486,[8] (see now, LSA-C.C. art. 3483), Monsanto Chemical Company v. Jones, 160 So.2d 428 (La.App. 2d Cir.1964); Callahan v. Authement, 99 So.2d 531 (La.App. 1st Cir. 1957).
Appellees' ancestor in title, E.A. Davis, purchased the property under three different deeds, all of which accurately describe the disputed tract (except that the deeds described the property as being located in St. Martin Parish). Originally E.A. Davis acquired an undivided half interest in the disputed tract in a cash deed from Charles Savoy in 1914. The title conveyed all of Mr. Savoy's rights, interests and pretentions in and to:
That certain yract [sic] of wood land situated in the Parish of St. Martin Parish, Louisiana, containong [sic] about 100 acres in superficial area and being well desctibed [sic] as that part of Section seventy three and seventy four in Township *414 Seven South of Range Eight East in the South Eastern Land District of Louisiana, lying East of Bayou Des Ours.
On January 20, 1919, E.A. Davis sold all of his right, title and interest to George Knight, the co-owner of the property. Five days later, on January 25, 1919, George Knight sold whatever rights, titles and interests the late Charles Savoy had in and to the disputed property back to E.A. Davis. Again, on August 8, 1931, E.A. Davis acquired the same property at a tax sale from the Sheriff and Ex-Officio Tax Collector of St. Martin Parish, which property had been assessed to "unknown owners." The Sheriff's deed described the property conveyed as follows:
40 acres. Rad. Sec. or lots 73 & 74 lying East of Bayou Des Ours. T. 7 S. R. 8 E.
On March 3, 1943, E.A. Davis obtained a quitclaim of the disputed property from the Board of Commissioners of the Atchafalaya Basin Levee District, which described the property conveyed as follows:
LANDS IN SECTIONS 73, 74, and 75, Township 7 South, Range 8 East, St. Martin Parish, La.
A certain tract or parcel of land situated in St. Martin Parish, Louisiana, being all of Radiating Section 73 except a small portion in the South-eastern end, and all of Sections 74 and 75, T. 7 S.R. 8 E. bounded: On the Northwest by Alabama Bayou, property of Ben F. Tucker, et al, and Iberville Land Company; on the Northeast by Alabama Bayou and property of Iberville Land Company, on the Southwest by property of Iberville Land Company; and on the East by the Section line of Section 72 T. 7 S.R. 8 E., property of W.L. Grace, Jr., and E.A. Davis.
We find that E.A. Davis held the disputed tract under three apparently valid titles. Good faith with regard to the purchases is not a consideration. Each deed was a notarial act, complete and proper on its face, valid in point of form; each deed adequately described the property with easily identifiable boundaries,[9] and would have transferred ownership if it had been executed by the true owner. We note that sheriff's deeds as well as quitclaim deeds are acts translative of title which may serve as the basis of a prescriptive title. See Board of Commissioners for Lafourche Basin Levee Dist. v. Elmer, 268 So.2d 274 (La.App. 4th Cir.), writ refused, 263 La. 613, 268 So.2d 675 (1972); King v. Board of Com'rs for Atchafalaya Basin Levee Dist., 148 So.2d 138 (La.App. 3d Cir. 1962), writ denied, 244 La. 118, 150 So.2d 585 (1963). Furthermore, a deed which conveys to purchaser "any right, title, and interest which the vendors might have" in and to the conveyed property is also an act which is sufficient to transfer title, and the fact that property is transferred without warranty does not preclude the title from being valid. Bolding v. Eason Oil Company, 248 La. 269, 178 So.2d 246 (1965); W.J. Gayle & Sons, Inc. v. Deperrodil, 300 So.2d 599, writ denied, 303 So.2d 186 (La. App. 3d Cir.1974).
The defendants' title to the disputed tract was acquired from E.A. Davis by universal succession. Although the disputed property was not specifically described in the judgment of possession, the defendants, as the heirs of E.A. Davis, inherited by operation of law whatever interest in the property their father may have had. Present LSA-C.C. art. 940, Hayward v. Noel, 225 So.2d 638 (La.App. 1st Cir.), writ denied, 254 La. 857, 227 So.2d 595 (1969). See also Deperrodil, 300 So.2d 599. Furthermore, according to civil code article 3485, (now LSA-C.C. art. 3483), a "transfer of ownership" sufficient to establish just title may be acquired by legacy. While it is true that a universal legatee does not acquire a new title, such that would permit a new possession, completely distinct from that of his grantor, he does acquire his ancestors' title, such as it is.[10] *415 Universal succession has been described as a mandatory substitution in that the universal successor merely continues the deceased's possession. "He succeeds to all of the latter's obligations as well as rights. It is thus not a new possession that begins but it is the deceased's possession that is transmitted to his heirs, with its virtues and its faults." Bartlett v. Calhoun, 412 So.2d 597 (La.1982), citing M. Planiol, Civil Law Treatise, Part 2, Sec. 2674 (12th Ed. La.St.L.Inst. trans. 1959). See also LSA-C.C. art. 3556, sub. 28 (repealed, Acts 1987, No. 125 § 2).
Accordingly we find that the defendants hold whatever title E.A. Davis held to the disputed property, and that defendants possessed to the limits of such title for a period of thirty years by virtue of their corporeal possession of a portion of the property.
After a thorough review of the record we find that the trial court's findings of fact and judgment are supported by the record and are not manifestly erroneous. For the reasons assigned, the judgment of the trial court is affirmed at appellants' cost.
AFFIRMED.
SHORTESS, J., concurs and will assign reasons.
APPENDIX

Eighteenth Judicial District Court

Parish of Iberville

State of Louisiana

Hattie G. Clifton, et al

vs.

Louise D. Liner, et al.

Number 23508

REASONS
Plaintiffs originally filed a possessory action against the defendants. After trial the Court made a finding that the defendants were in possession of the property in dispute for a period in excesss of one year and rendered judgment ordering the plaintiffs to assert their claims in a petitory action. Pursuant to the judgment, the plaintiffs have filed this petitory action to be declared owners of the property.
The plaintiffs' burden of proof as set forth in LSA-C.C.P. Art. 3653 is to prove that they have acquired ownership from a previous owner. They must prove valid record title without reference to the quality of the adverse claimant's title. Pure Oil Company v. Skinner, 294 So.2d 797 (La. 1974).
Defendants contend plaintiffs have failed to carry the burden of proof in connection with the following evidence:
1) Plaintiffs' Petitory # 1. A document from the Louisiana Land Office identifying G. Merrick Miller as patentee.
2) Plaintiffs' Petitory # 2. An act of sale from G. Merrick Miller to A.G. Miller, dated May 22, 1856.
3) Plaintiffs' Petitory # 3. An act of exchange by which the property was transferred from A.G. Miller to John C. Miller.
4) Plaintiffs' Petitory # 4. Photocopy of assessment rolls of St. Mary Parish, Louisiana, for 1885 showing the disputed tract assessed to J.C. Miller.
5) Plaintiffs' Petitory # 5. A sheriff's deed showing conveyance of the property to Elodie Brusle, widow of Alexander Schlater.
6) Plaintiffs' Petitory # 6. An act of sale to Edward B. McCorkle from Lelia Schlater Sherburne, assisted and authorized by her husband, Henry N. Sherburne.
As to No. 1, defendants contend the instrument introduced is not a patent. It is a photocopied notation from the Louisiana Land Office patent book designated Certificate No. 2505 N.S., dated February 5, 1856, related to patent No. 2234. G. Merrick Miller is shown as the patentee. Proof of *416 severance from the sovereign is necessary. A patent with seal and signature constitutes such proof. Nevertheless, when the extract was introduced in evidence, there was no objection made. Moreover, authenticity of the documents was stipulated so that certification was unnecessary. The document obviously is relevant and tends to prove that the property was patented to G. Merrrick Miller. Plaintiffs' burden of proof is as stated in the codal article cited above, but nothing suggests that proof must be made by other than a preponderance of properly admitted evidence. The document from the Louisiana Land Office satisfies the burden of proof as to this point in the absence of a contemporaneous objection to its introduction.
The next issue raised is with respect to documents # 5 and # 6. Defendants contend that the failure to connect Elodie Schlater and Lelia Sherburne results in a complete gap in plaintiffs' chain of title. There is no succession proceeding. Defendants say that plaintiffs failed to produce evidence that Lelia Sherburne is the heir of Elodie Schlater. This is not correct.
The entire record, including all evidence introduced in the possessory action, was offered in the subsequent petitory action. Plaintiffs' Exhibit # 2 in the Possessory Action was the record in Suit No. 1081. Edward B. McCorkle vs. Charles Savoy, 21st Judicial District Court, Parish of Iberville. In that case the Clerk of Court, Joseph A. Grace, testified that Elodie Brusle, widow of Alex Schlater, was dead, and that her sole heir was a daughter, Lelia Schlater Sherburne. He further testified that no succession had ever been opened, but that by notarial act offered as "P-3" being an act of sale of other property of the succession from Mrs. Lelia Sherburne, wife of H.N. Sherburne, Jr. she had specifically accepted the succession of her mother purely and simply.
Also in that case Capt. Charles A. Brusley, 75 years of age, former Sheriff of the parish, testified that Mrs. Elodie Brusle, widow of Alex Schlater, was his daughter, that she died in 1900, and left only one heir, Lelia Schlater, wife of H.N. Sherburne, Jr. He further testified that Mrs. Elodie Brusle Schlater was a widow when she acquired the property, her husband having died in 1878.
In the opinion of the Court, the proceedings in McCorkle v. Savoy established the link of title between Elodie Brusle Schlater and Lelia Schlater Sherburne, with at least equal credence as an ex parte succession proceeding supported by out-of-court affidavits would have done.
Defendants contend that in Plaintiffs' Exhibit # 3 the parties' wives are not identified, although it contains the following words: "... came personally and appeared Almerin G. Miller and his wife of the one part and John C. Miller and his wife of the other part...." This contention overlooks the following wording from the second page of that document: "Also, came and appeared Mrs. O.E. Blount, wife of said A.G. Miller, and Mrs. E.R. Scott?, wife of said J.C. Miller, and made themselves parties to this act...." The document is signed by A.G. Miller, John C. Miller, Emilie R. Miller and O.E. Miller.
Defendants point out that in Exhibit # 2, the purchaser's marital status is not given. They cite Rivet v. Dugas, 377 So.2d 489 (La.App. 4th Cir.1979) and Bossier v. Shell Oil Co., 430 So.2d 771 (La.App. 5th Cir. 1983) to show that plaintiffs have not made out good title. The failure of that document to state the marital status of the purchaser is a matter that could easily have been raised in the earlier petitory action wherein plaintiffs' ancestor in title was recognized as owner of the property. That act was passed in 1856; the lawsuit occurred in 1909. For reasons explained in the following discussion, defendants cannot urge in these proceedings matters which could have been raised by their ancestor in title in the prior litigation.
Defendants contend that the judgment in Edward B. McCorkle vs. Charles Savoy, Suit No. 1081, 21st Judicial District Court, Iberville Parish, which recognized Edward B. McCorkle as owner of the disputed property *417 in a petitory action, is not res judicata as to the issue of ownership, because they contend they are not successors in title of Charles Savoy. Plaintiffs are successors in title of Edward B. McCorkle, the prevailing party in that suit.
Plaintiffs contend that defendants are indeed the successors in title of Charles Savoy, the unsuccessful litigant in that suit. According to defendants' argument, the sale from Charles Savoy to George Knight and E.A. Davis conveying "all of his rights, interests and pretentions in and to "the disputed property was merely a quitclaim, which served as "just title for purposes of ten-year acquisitive prescription, but which conveyed nothing since Savoy had no interest in the property. As no interest was conveyed by Savoy, argue the defendants, they cannot be his successors in title.
They fail to cite any authority, however, for the proposition that the transferees of a quitclaim deed are not successors in title of the transferor. Indeed, if this were the law, there would be no occasion for the application of res judicata to successors in title of the respective litigants in a petitory action when the plaintiff in that action has prevailed, because the gravamen of that action is to establish that the plaintiff is the sole owner. If the plaintiff is successful, the defendant has no interest in the title to be transferred. Any transfer, with or without warranty, by such unsuccessful litigant would then give rise to the possibility of re-litigation by the transferee. Thus, no lasting stability of title would have been achieved by the prior suit. The general rule is that successors in title stand in the shoes of their ancestors in title as identical parties for puposes of res judicata. Of course, res judicata applies only to the issues tried in the original litigation and does not affect rights peculiar to the successor in title which the ancestor in title could not have asserted in the earlier lawsuit. See Quinette v. Delhommer, 247 La. 1121, 176 So.2d 399 (1965). (Thus claims of title by 10-year and 30-year prescription discussed later cannot be defeated by a plea of res judicata.)

PRESCRIPTION
The property in question (color-coded PINK on exhibits in evidence) is a triangular area bounded on the East by other property conceded to belong to the plaintiffs (color-coded YELLOW). It is bounded on the Northwest and Southwest by other property conceded to belong to defendants (color-coded BLUE). Bayou Des Ourses runs along the Northwest boundary, then meanders northward as the boundary between uncontested property of the defendants on the West and uncontested property of the plaintiffs on the East to empty in Bayou Alabama which is the northern boundary of the respective uncontested properties of plaintiffs and defendants.
The uncontested property of plaintiffs is in Section 72, T7S-R8E, Iberville Parish. The contested property is that portion of Sections 73 and 74, T7S-R8E, Iberville Parish lying East of Bayou Des Ourses. Defendants' uncontested property is that portion of Sections 73 and 74, Iberville Parish, situated west of Bayou Des Ourses, and all of Section 75, T7S-R8E, St. Martin Parish. Thus part of defendants' property is in Iberville Parish and part in St. Martin Parish. (A small part of Section 72 lying West of a meander of Bayou Des Ourses also belongs to defendants.) All of the property is in the Morganza Floodway.

TEN-YEAR PRESCRIPTION
In the case of Edward B. McCorkle vs. Charles Savoy, decided July 26, 1910, the property in question was adjudged to be in Iberville Parish. The unsuccessful litigant sold all of his right, title and interest in the property to George Knight and E.A. Davis on July 24, 1914 describing it as being in St. Martin Parish (despite the contrary holding in the lawsuit).
On January 20, 1919 Edward A. Davis sold all of his right, title and interest to George Knight. And five (5) days later on January 25, 1919 George Knight sold "whatever rights, titles and interests the *418 late Charles Savoy has in and to the property" back to Edward Albert Davis.
There is no evidence of possession of the property by Charles Savoy, George Knight or E.A. Davis between 1910 and the transactions of 1919. What is of particular note is that when E.A. Davis sold to George Knight he sold two pieces of property. The first is described as the undivided half of a certain tract of land in St. Martin Parish (apparently transferred thus with full warranty) which are those tracts of land (color-coded BLUE in the exhibits) which are conceded to belong to defendants. The second purports to sell "all of Vendor's rights, titles and interests" in the property which is the subject of this lawsuit, so that this disputed property was sold by E.A. Davis without warranty in the same deed by which he sold the remainder of the property with warranty.
In the deed by which E.A. Davis re-acquired from George Knight the same distinction occurs. The undisputed property is transferred with warranty and the property now disputed was transferred as "whatever rights, titles and interests the late Charles Savoy has in the property (emphasis added).
In the opinion of the Court the 1914 and 1919 transactions cannot form the basis for good faith possession. See e.g. Bd. of Com'rs., etc. v. S.D. Hunter Foundation, 354 So.2d 156 (La.1977).
Curiously, on August 8, 1931 E.A. Davis acquired the same property at tax sale from the Tax Collector in St. Martin Parish which property had been assessed to "unknown owners." Apparently while claiming to be the owner, he had never been shown as owner on tax assessment rolls.
On March 3, 1943 the same E.A. Davis obtained a quitclaim for the property ("except a small portion on the Southeastern end" of Section 73) from the Board of Commissioners of the Atchafalaya Basin Levee District. The property is still described as being in St. Martin Parish in all these transactions.
In the opinion of the Court all of these transactions by themselves show that E.A. Davis knew he had no title or that his title was defective.
(NOTE: While not relevant to the issue of the notice to the purchaser of possible defects in the title at time of purchase, it is noted that the same distinction with regard to warranty was made by E.A. Davis in the Flowage Deed to the U.S. in July 28, 1943 wherein the subject property was designated No. 2-A-ABF and the adjoining property conceded to belong to defendants was given another designation. The following clause is included: "The conveyance of the easement aforesaid in and to Tract No. 2A-ABF as above described is warranted only to the extent of vendor's right, title and interest thereto and no further.")

THIRTY-YEAR PRESCRIPTION
In 1931 E.A. Davis began paying taxes on the property in St. Martin Parish, and continued to do so yearly until 1948. From 1949 forward he paid taxes in Iberville Parish.
(In 1919 the St. Martin Parish Police Jury had appointed a surveyor to meet with a surveyor appointed by Iberville Parish in order to ascertain and fix the parish boundary. An Iberville Parish survey had been made in 1910. St. Martin Parish had taken no action on the 1910 survey. In 1920 the St. Martin Parish Police Jury filed suit against the Police Jury of Iberville Parish to have the later survey recognized. An exception of no cause of action was filed. Some twenty-one years later, no further steps having been taken therein in the meantime, the suit was dismissed on plaintiff's own motion on March 10, 1941. Some years later suit was again filed by St. Martin Parish against Iberville Parish to establish the boundary. Interpretation of Act 130 of 1847 was the issue. The Supreme Court finally ruled in favor of Iberville Parish in St. Martin Parish Police Jury v. Iberville Parish P.J., 212 La. 886, 33 So.2d 671 (1947). The subject property was again judicially determined to be in Iberville Parish. This time by a divided Supreme Court.)
*419 The same year that E.A. Davis began paying taxes on the subject property, he caused timber to be cut from the property. After 1931 the timber operations by the defendants were conducted on a regular basis. Timber was cut from the subject property in 1936, 1945, 1955, 1973 and 1974. In addition, Mr. Summers, a forester, testified that he ran a timber estimate for the defendants in 1966. Why there was no timber sale pursuant to the 1966 estimate is not explained, but the act of making a physical estimate is an act of possession which demonstrates the regularity of timber harvesting and management.
Defendants granted oil, gas and mineral leases on March 3, 1943, August 9, 1956, September 23, 1962, September 23, 1967 and September 24, 1972.
In 1940 Amilcar Frederick, Charles Frederick and Jack Johnson executed "acknowledgments of tenancy" declaring that they had occupied the lands in question as tenants of E.A. Davis for "the past many years."
Lawrence Summers testified that he married Amilcar Frederick's daughter in 1945, and that his father-in-law had been engaged in commercial trapping, hunting and fishing on the subject property. In 1950 Mr. Summers took over the camp by agreement with the defendants. The camp structure itself is not on the subject property. It was on defendants' adjoining property. On November 1, 1973 the defendants granted a one-year hunting lease with one-year renewal to Lawrence L. Summers. On November 1, 1978 a similar lease was granted to him for a term of five years and four months.
He further testified that since 1945, he and his father-in-law had been in control of the property, and had kept others off. This latter statement does not fully agree with people hunted in the area without knowledge or regard for ownership. In 1976, these witnesses say, Lawrence Summers told them they could not hunt in the disputed area. (See testimony of Joseph Stute, Dr. Robert Morrow, Sr., Kate Lalonde and Murray Rabalais).
Defendants granted a servitude to Gulf States Utilities Company on October 24, 1964. This matter was discussed in the reasons handed down in connection with the possessory action. (Plaintiffs also granted a similar servitude to the same company on October 30, 1964.)
On July 28, 1943 E.A. Davis granted a flowage servitude to the United States of America, and in 1973 the United States exercised their rights by allowing the lands to be flooded. One witness estimated flooding to have lasted 30 to 40 days; another 3 to 4 months.
Despite all of these acts of possession plaintiffs, whose ancestors initially had possession, contend that they have continued in possession by payment of taxes in Iberville Parish, and other acts of possession. On January 24, 1972 they granted an oil, gas and mineral lease on the property. (With regard to taxes it appears the governing authorities profitted well. Prior to 1947 St. Martin Parish collected taxes to which it was not entitled, and after that year Iberville Parish apparently collected from two sets of owners.) In addition, Dr. Robert Morrow, Sr. hunted on the disputed property with plaintiffs' exclusive permission from 1955 until 1976. Plaintiffs granted Patrick Morrow a hunting lease in 1976.
Plaintiffs also contend that defendant, Mrs. Theriot, acknowledged the plaintiffs' ownership of the property when she wrote a letter to E.A. Courtney on May 18, 1961 regarding lease of their properties for crawfish farming, enclosing a map or sketch which shows the property East of Bayou Des Ourses as belonging to Hattie G. Clifton, et al. This Court is of the opinion there was no intent to make such an acknowledgment. It is quite possible Mrs. Theriot was not familiar with the is quite possible Mrs. Theriot was not familiar with the significance of tie marks across section lines on a map to show identity of ownership between two tracts of land. Considering that such an acknowledgment would be totally inconsistent with the evident intent to claim ownership demonstrated by other acts, this Court would expect a *420 more unequivocal disclaimer to accept plaintiffs' view.
Plaintiffs contend that defendants could not have had continuous and uninterrupted possession of the property, because they granted an oil, gas and mineral lease on the property, continued to pay taxes, and exercised hunting rights. There was no evidence that anything was ever done physically on the property in connection with the mineral lease. There is no evidence to what extent Wade O. Martin exercised any rights on the subject property by virtue of the fifteen-year lease from William L. Grace, Jr. (plaintiffs' ancestor in title) dated February 19, 1938, for hunting, farming and grazing purposes. Thus the only acts of physical possession by the plaintiffs were the occasional hunts on the property by Dr. Morrow.
An indication of the transitory nature of plaintiffs' use of their property, is the alleged fact that they were unaware of the defendants' repeated timber operations on their land. Hunting and timber operations may or may not occur at the same time but the evidence of timber operations remains through several seasons. Possession by timber operations is open and notorious. On the other hand, use of land by hunting may be unnoticed.
In the opinion of the Court plaintiffs' occasional use of the property did nothing to disturb the defendants' exercise of dominion.
Plaintiffs contend that the possession exercised by E.A. Davis was precarious. They contend that he exercised possession as assignee or sub-lessee under their lease to Wade O. Martin which had been "released" to E.A. Davis. There is no need to repeat the discussion of the so-called "release," reference is made to this Court's reasons in the possessory action. This Court said in part, "The possession exercised by Davis after he acquired rights under the lease was not an adverse possession, and had no other steps been taken, it would have served to render precarious any prior acts of adverse possession." The notable fact is that other steps were in fact taken. Davis and later his successors continued to exercise acts of possession of the property far beyond any rights acquired under the assignment of Martin's lease. There is no evidence that Davis kept the prior lease in effect by payment of rent to the plaintiffs' ancestor. Timber operations were conducted in 1945, and regularly thereafter. These acts were totally inconsistent with possession as tenant. In short, as pointed out in the reasons in the possessory action, defendants continued to exercise dominion over the property.
In the opinion of the Court the defendants' plea of 30-year acquisitive prescription must be maintained.
Plaquemine, Louisiana, September 30, 1987.
 /s/ Ian W. Claiborne
 JUDGE
SHORTESS, Judge, concurring.
I agree with the majority opinion insofar as it holds that defendants established acquisitive prescription of thirty years of the property in dispute. I concur because the majority has confused the distinction between acquisitive prescription under LSA-C.C. art. 3478 through 3498 (subtitled "Of the Prescription of Ten Years") and that under LSA-C.C. art. 3499 through 3505 (subtitled "Of the Prescription of Thirty Years").[1]
The majority reasons that bad faith possession under "just title" should be accorded some of the attributes of good faith possession, more particularly, constructive possession. See LSA-C.C. art. 3498 (providing that one with "title and possession conformably to it ... is presumed to possess according to the title and to the full extent of its limits"). A possessor in bad faith, however, cannot have just title, as is evident from the plain language of the code article defining same. LSA-C.C. art. 3489 defines "just title" as that "which the possessor may have received from any person whom he honestly believed to be the real *421 owner, provided the title were such as to transfer the ownership of the property" (emphasis mine). The holder of a "just title" under this article, therefore, would necessarily have to be a possessor in good faith. See also Monsanto Chemical Co. v. Jones, 160 So.2d 428, 431 (La.App. 2d Cir. 1964). Article 3484, appropriately, appears in the grouping of code articles subtitled "Of the Prescription of Ten Years." See LSA-C.C. art. 3478 through 3498.
The majority cites LSA-C.C. art. 3503 in conjunction with LSA-C.C. art. 3498, apparently reading the latter as applying to thirty years acquisitive prescription pursuant to the former, which provides that those rules "established in the preceding paragraph" (i.e., the grouping subtitled "Of the Prescription of Ten Years") not contrary to or incompatible with thirty years acquisitive prescription, are applicable. Additionally in support of this reasoning, the majority cites Burat v. Board of Levee Commissioners, 469 So.2d 1022 (La.App. 4th Cir.), writ denied, 475 So.2d 1095 (1985); Johnson v. La Bokay Corp., 326 So.2d 589 (La.App. 3d Cir.1976); and Succession of Seals, 142 So.2d 629 (La.App. 2d Cir.1962), reversed in part, 243 La. 1056, 150 So.2d 13 (1963).
Johnson v. La Bokay Corp. did not specifically hold that the party found to have constructively possessed was in good faith, but the issue appears not to have been raised. Good faith is always presumed and must be proved by the party alleging otherwise. LSA-C.C. art. 3481. Moreover, it appears from a reading of that opinion that the constructive possessor was in fact in good faith. See 326 So.2d at 591-92.
Succession of Seals, 142 So.2d 629 (La. App. 2d Cir.1962), reversed in part, 243 La. 1056, 150 So.2d 13 (1963), involved a claim of thirty years acquisitive prescription by one co-owner against the other co-owners in indivision. The adversely possessing coowner was determined to have been in bad faith and the opinion implies that constructive possession could have applied, construing Article 3503, as does the majority here, to distinguish between bad faith possession with title and without title. The court found, however, that the acts of possession were not sufficiently open and hostile, thus the language is dicta. The supreme court reversed on this issue without mention of the lower court's construction of Article 3503. See 150 So.2d at 19-20.
I disagree with the reasoning of Burat. The court in Burat held:
"In the case of thirty year prescription founded upon just title, the possessor's good faith is not a consideration. C.C. Art. 3475 (1870) (now, C.C. Art. 3486). Rather, the possessor must only show just title and thirty years possession. In the case of thirty years possession plus title, corporeal possession of a part of the immovable shall be deemed to be constructive possession of the whole within the limits of the title. C.C. Art. 3498 (1870). See also: C.C. Art. 3426 (1982), comment (d), and Hill v. Richey, 221 La. 402, 59 So.2d 434 (1952)."
As discussed hereinabove, "just title" is wholly inconsistent with acquisitive prescription of thirty years. Thirty years acquisitive prescription requires neither title nor good faith. LSA-C.C. art. 3499 reads: "The ownership of immovables is prescribed for by thirty years without any need of title or possession in good faith." Ten years prescription requires both just title and good faith.
Hill v. Richey, 59 So.2d 434 (La.1952), relied upon by the court in Burat, addressed the question whether, for purposes of a possessory action possession within boundaries requires enclosures. 59 So.2d at 439-40. It is not dispositive of the issue for which it was cited to support.
The Burat court also cited LSA-C.C. art. 3426 (1982) comment (d), which provides, in pertinent part, "[i]n the absence of title there is no constructive possession...." More on point, LSA-C.C. art. 3426 (1982) comment (b) reads, in pertinent part, "one may have constructive possession regardless of good or bad faith" and comment (c) reads:
"The notion of constructive possession is pertinent for both the ten and thirty years' acquisitive prescription. Thus, one who possesses an immovable by virtue *422 of a title in bad faith may prescribe in thirty years on proof that he had possession of a part, and therefore constructive possession of the whole within the limits of his title."
Both statements are made without citation. Additionally, the all too common reassurance that the article "does not change the law" is found in comment (a). LSA-C.C. art. 3426 (1982), comment (a).
Consistent with the comments to LSA-C.C. art. 3426 (1982), the definition of "just title" has been changed to delete the requirement that the holder "honestly believe" that the title is valid. LSA-C.C. art. 3483 (1982). Comment (g) links this change to constructive possession:
"When a person has a just title and his possession conforms to it, he is presumed to possess according to the title and to the full extent of its limits. See Article 3426, supra. Constructive possession applies to both the ten and the thirty years prescription. Thus, one who possesses by virtue of a just title but in bad faith possesses within the limits of his title. In contrast, one who possesses without title must prove possession within enclosures or inch by inch possession."
I have previously expressed mistrust of the statement in the revision comments that the new articles effect no change in the law. Wilkin v. Dev. Con Builders, 546 So.2d 254, 258 (La.App. 1st Cir.1989) (Shortness, J., dissenting) (citing Palmer, The Death of a CodeThe Birth of a Digest, 63 Tul.L.Rev. 222 (1988)).
Under the current code articles it is clear that one can in fact have "just title" without good faith. It is equally clear that this is a change from the Civil Code of 1870, notwithstanding statements in the comments to the contrary. It should be observed that the bad faith possessor is not one who determines some time after acquiring his title that it is defective, but rather, knows at the time of acquisition that there is a problem. LSA-C.C. art. 3482. Allowing some legal advantage from a document known to be worthless (or, at best, contingent) encourages the trade in such documents. Even more troubling, however, is the effect upon the party against whom adverse constructive corporeal possession on the basis of a known invalid title is allowed to run. The following example is illustrative:
The title to two adjoining tracts of property overlap in the northwest and southeast corners, respectively. The owner of the northwestern tract is in bad faith insofar as the overlap but is in corporeal possession of the undisputed portion, while the southeastern tract owner is in good faith, but civil possession.
If the southeastern tract owner were to visit his property what notice would he be given as to the adverse possession of the northwestern corner? There are no "external and public signs." See LSA-C.C. art. 3501. The adverse possessor's possession is not "public and unequivocal." See LSA-C.C. art. 3500. A landowner cannot be expected to patrol the public records. The overextensive title cannot provide sufficient notice inasmuch as it is no more than a disturbance in law. See Chauvin v. Kirchoff, 194 So.2d 805, 813 (La.App. 1st Cir. 1967).
Admittedly, there is no more notice where the holder of the overextensive title is in good faith and is given the benefit of constructive possession. This is, however, an exception to the rule that one can acquire no greater rights than the party from whom he acquires title. See Linton v. Guillotte, 10 Rob. 357 (Orleans 1845); 2 Aubry & Rau, Droit Civil Francais, ndeg; 70 (Civil Law Translations 1966). Acquisitive prescription based on just title and good faith is also an exception. Baudry-Lacantinerie & Tissier, Traite Theorique Et Pratique De Droit Civil, n° 651 (Civil Law Translations 1966). It is founded on societal considerations which disfavor absentee landholders in order to ensure the quieting of title by inaction and the passage of time. See Baudry-Lacantinerie & Tissier, supra, n° 650; 1 M. Planiol, Tratie Elementaire De Droit Civil, n° 2645 (12 ed. 1939) (La.St. L.Inst.Trans.1959). The balancing of interests which bestows certain advantages upon the good faith possessor is in the public interest. The same cannot be said *423 of the instance where the bad faith possessor is allowed to profit through constructive possession by the fact that he has a title. The majority's holding sanctions clandestine possession. For these reasons, I disagree with the majority's holding insofar as it allows defendants constructive possession.
I concur with the result because I believe that defendants proved actual possession, through logging operations and hunting deeds, of the disputed property. The record reveals that the timber cuttings were made to a blazed line which approximated the section line between sections 72 and 73, thereby encompassing the disputed property. Defendants' lessees hunted the disputed property extensively. The nature of the property allowed little else in terms of acts of possession. These acts were public and unequivocal, LSA-C.C. art. 3501, which provided notice that defendants intended to possess the property as owners thereof.
I respectfully concur.
NOTES
[1] Plaintiffs originally initiated a possessory action, and after trial on the merits, the trial court found defendants to be in possession of the disputed tract. Thereafter the plaintiffs filed the present petitory action, alleging that they are the title owners of the disputed tract.
[2] Because we affirm the trial court judgment, we need not address appellants' assignment of error regarding the denial of a new trial.
[3] We note that appellees point out that the trial court, in its reasons for judgment, never specifically stated that the plaintiffs established good record title to the disputed tract. We assume such a finding implicit in the trial court's reasons. The trial court's reasons clearly address every contention of the defendants with regard to defects in the plaintiffs' title. Thereafter the court went on to maintain the exception of thirty years prescription. Because the court went on to determine whether the defendant possessors had established thirty years prescription, we are convinced that the trial court found that the appellants established their title good against the world. Without a finding of good title, it would have been unnecessary for the court to proceed any further. We also note that the defendants did not appeal nor answer the appeal, therefore the trial court judgment with regard to the plaintiffs' title is final.
[4] At this point we note that all subsequent references will be to those code articles prior to the 1982 amendments, unless otherwise stated.
[5] LSA-C.C. art. 3498 reads as follows:

When a person has a title and possession conformably to it, he is presumed to possess according to the title and to the full extent of its limits.
[6] LSA-C.C. art. 3503 reads as follows:

How favorable soever prescription may be, it shall be restricted within just limits. Thus, in the prescription of thirty years, which is acquired without title, it extends only to that which has been actually possessed by the person pleading it.
[7] See also Bolding v. Eason Oil Company, 248 La. 269, 178 So.2d 246 (1965), regarding the application of constructive possession to acquisitive prescription.
[8] Civil Code Article 3484 required the possessor's honest belief that he is purchasing from the true owner. That good faith requirement is incompatible with articles pertaining to thirty years acquisitive prescription. Under the current law the definition of just title no longer requires the possessor's honest belief that he is purchasing from the true owner.
[9] Although each deed describes the property as being located in St. Martin Parish, it is not fatal to the property description as the remaining description adequately describes the property.
[10] Because the defendants are asserting ownership by virtue of thirty years acquisitive prescription, the fact that they acquired whatever title the deceased had, and not a new title, is of no consequence. The distinction between universal and particular legatees only becomes important when a party wishes to establish prescription by virtue of ten years acquisitive prescription. For an excellent discussion of the distinctions between universal and particular legatees and the tacking of possession see Bartlett v. Calhoun, 412 So.2d 597 (La.1982).
[1] All reference to articles of the Civil Code will be to those existing prior to the 1982 amendments to Title XXIII, Chapters 2 and 3, unless otherwise specified.