558 So.2d 1279 (1990)
Cecil Darrell SHIPLEY
v.
RECREATION AND PARK COMMISSION FOR the PARISH OF EAST BATON ROUGE, et al.
No. 88 CA 1539.
Court of Appeal of Louisiana, First Circuit.
February 21, 1990.
Rehearing Denied April 25, 1990.
*1280 Byron Magbee, Baton Rouge, for plaintiff-appellant Cecil Darrell Shipley.
Cyrus J. Greco, Baton Rouge, for defendant-appellee Recreation and Park Com'n for the Parish of East Baton Rouge.
Louis Orsatti, Fountain Valley, Cal., David N. Levinson, Wilmington, Del., for defendant-appellee Bolco Athletic Co.
Before COVINGTON, C.J., and WATKINS and SHORTESS, JJ.
WATKINS, Judge.
Plaintiff filed suit against defendants, Baton Rouge Recreation and Parks Commission (BREC) and Bolco Athletic Company (Bolco), for injuries he sustained while playing softball on a field owned by BREC which used baseball bases manufactured by Bolco. The trial court dismissed all of plaintiff's claims. We affirm.
On the night of July 24, 1980, the plaintiff was playing a game of fast pitch softball on a field owned and maintained by BREC. The field was located at Forest Park on Harrell's Ferry Road. The game was conducted under the auspices of the Baton Rouge Amateur Softball Association *1281 (BRASA),[1] of which plaintiff was a member. BRASA paid BREC a nominal fee for the use of BREC softball fields during the regular softball season,[2] and also paid the umpires and scorekeepers for all league games. BREC employees maintained the fields on a daily basis during the regular season, working until 3:30 p.m. After that time the fields were turned over to the BRASA officials who were conducting the games. The officials made the final decision as to whether the field was playable or whether it needed to be reworked. BREC supplied the BRASA officials with access to equipment and fresh dirt with which to repair the field before or during a game.
On the night of July 24, 1980, two league games were played on field number three at Forest Park. During the second game, which began at approximately 9:30 p.m., the plaintiff suffered a dislocated ankle while sliding into second base. The plaintiff claims that his right foot, which was extended during the slide, got caught under the base, causing his injury. The plaintiff testified that the base was elevated and that he saw this condition when he rounded first base.
Plaintiff sued BREC alleging that it failed to properly and safely install the Bolco base, and that it failed to maintain its ball field in a safe and reasonable condition. Plaintiff also sued Bolco alleging that the Bolco base, which was installed at second base, was defective in design; that Bolco failed to adequately warn anticipated users or consumers of the base's hazards and of the consequences of improper installation, and, that the base was unreasonably dangerous per se. Subsequently Bolco filed a third party demand against BREC seeking indemnity and contribution for any damages suffered by the plaintiff as a consequence of improper selection, installation or maintenance of the base, or improper maintenance of the field. BREC also filed a third party demand against Bolco.

NEGLIGENCE OF BREC
We first address the issue of whether BREC was negligent in its maintenance of the softball field or its installation of the Bolco base. The plaintiff contends that because the trial court concluded that the base was not level with the ground when the plaintiff slid into second base we must find that BREC negligently installed the Bolco base and negligently maintained the field. It is not disputed that the field surrounding second base should be maintained level, free of holes and depressions. However, it is also undisputed that during the course of a game depressions can occur from normal use, which includes sliding. Thus a field can be ruled playable at the beginning of a game and thereafter become hazardous. The evidence establishes that at the time the first game began the field was ruled playable and that sometime thereafter a depression developed around second base. Mr. Barry Lee Browning worked for BREC in 1980 as the head of the ball field maintenance crew for Forest Park. Mr. Browning testified that on July 24, 1980, he and his crew worked all three ball fields at Forest Park. Each base was removed and the underlying dirt was scraped away, leaving the base flush with the ground. Mr. Browning also testified that there was no procedure for maintenance by BREC employees between regular season games. Mr. Steve Whitfield, an umpire for BRASA, testified that he was the home plate umpire for both games played on field number three on July 24, 1980. He recalled that prior to the first game the softball team members had to rework the field because of rain; Mr. Whitfield could not recall if the field was reworked before the second game. He further testified that the players and managers generally assisted in determining whether the field was playable. From all indications the game could have been stopped to repair a problem, such as a gap *1282 under a base; however, the testimony of the umpire, the plaintiff, the team manager, and another team player reveals that no one complained about the field prior to the plaintiff's being injured.
BREC owed a duty to maintain its softball parks in a fashion commensurate with ordinary and reasonable care under the circumstances. But, it is not the insurer of the safety of those making use of the facilities; it is not required to eliminate every source or possibility of danger. Godfrey v. Baton Rouge Recreation & Parks Commission, 213 So.2d 109 (La.App. 1st Cir.), writ refused, 252 La. 958, 215 So.2d 128 (La.1968). Although the gap between the ground and second base constituted a clear hazard, the plaintiff failed to prove that BREC's duty to maintain the field extended to the time when the plaintiff was injured. Based on the evidence presented we find no error in the trial court's finding that plaintiff failed to prove that the condition of the field the night of his injury was due to any negligence on the part of BREC in maintaining the field.
The evidence also supports the trial court's finding that BREC was not negligent in its installation of the Bolco base. Several BREC employees testified concerning the installation of the Bolco bases at their ball parks. Mr. Jesse Townsend, the maintenance foreman for BREC in 1980, testified that he installed the Bolco bases and that he gave instructions to the ball field crews not to leave gaps under the bases. According to his testimony the bases on field number three should have been flush when the first game started on July 24, 1980. Mr. Willard Landry, the BREC Junior Sports Director in 1980, testified that he checked all the fields at the beginning of the season to make sure that the bases were correctly installed, flush with the ground. The only evidence plaintiff presented concerning his contention of improper installation of the base was the fact that on the night of July 24, 1980, after at least one game had been played on the field, second base was elevated. Because base elevation can occur from normal use during a game, we find no error in the trial court's findings.

PRODUCTS LIABILITY

FACTS
Plaintiff also seeks to recover damages based on several theories of products liability. Plaintiff contends that the Bolco base is unreasonably dangerous per se, unreasonably dangerous in design and unreasonably dangerous for normal use because of Bolco's failure to adequately warn of the product's dangers. In this regard the plaintiff presented the testimony of Mr. Joseph Brownlee who was accepted by the court as an expert in the area of athletic recreation safety and hazards. According to Mr. Brownlee, the Amateur Softball Association's guidelines require softball bases at first, second and third bases to be firmly affixed to the ground and not thicker than five inches. The 15-inch by 15-inch Bolco base is three inches thick and has an anchoring system which secures the base firmly to the ground. The base serves the purpose of a point of reference on the softball field and outlines the dimensions of the field. The base is not for the purpose of stopping forward motion. Mr. Brownlee's primary complaint concerning the Bolco base was the fact that the base is, as he described it, extremely hard and non-resilient. In his opinion the canvas strap-down base, which was available at the time of the plaintiff's injury, performs the same functions as the Bolco base with less risk of severe injury. Although Mr. Brownlee admitted that the canvas strap-down base also presents risks to a ball player, he described the injuries as being less severe than those caused by a Bolco base. He explained that because the canvas strap-down base was softer and more resilient, players were more likely to suffer sprains and strains than leg fractures. Mr. Brownlee went on to explain that in his opinion all bases with permanent anchoring devices are dangerous and that either a throw-down *1283 base (one which is not secured to the ground), or bases similar to home plate (i.e., not above ground level) should be used. Of course he admitted that if these types of bases were used it would require a change in existing softball rules to accommodate base movement and instances where the players would slide over the bases. Although these suggestions for alternative bases would perhaps make the sport of softball safer, we cannot consider them in the context of this case. We can only examine the Bolco base within the context of the rules of the actual game and not an imaginary game which does not exist.
The Amateur Softball Association rules require a fixed base not thicker than five inches. The Bolco base conforms to these standards and is dimensionally the same as the canvas strap-down base. Furthermore, sliding toward a base is an inherent part of the game of softball and is a dangerous maneuver. Mr. Brownlee testified that according to a Consumer Product Safety Commission report, 479,000 baseball and softball injuries requiring hospital attention were reported in 1981, and 442,090 injuries were reported in 1980.
Mr. Brownlee also testified concerning the adequacy of the instructions which came with the Bolco base which are as follows:

In 1984 the following WARNING sticker was included with the Bolco bases:

*1284 WARNING
The Bolco Athletic Co. advises that sliding into a baseball base represents a clear and present danger. Injury may occur.
Bolco bases are designed to be a reference point on a ball diamond. They are not designed to stop forward momentum or be used as a shock absorber. Anyone sliding into a baseball base risks serious injury.
Mr. Brownlee testified that a 1987 report of the Consumer Product Safety Commission, found the instructions for Bolco bases inadequate because the instructions failed to inform the user of proper maintenance and the associated hazards of improper maintenance. However, we note at this point that each employee of BREC testified that he understood the proper maintenance procedures for the Bolco bases and that he knew that the hazards of improper maintenance included the possibility that a player would trip on the base or get his foot caught underneath the base.
Mr. Louis Clinton Orsatti, vice president of Bolco, testified that his father designed the Bolco base with recessed straps and stronger material in order to remedy the problems inherent in the traditional canvas strap-down base. The problems associated with strap-down bases are that the straps loosen causing tripping, cleats tear the canvas and get caught in the canvas, and the base does not lie flat, causing tripping.

LAW
"In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control." Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986).
"A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product." Halphen, 484 So.2d at 114. Under this theory, liability may be imposed solely on the basis of the intrinsic characteristics of the product irrespective of the manufacturer's intent, knowledge or conduct. Halphen, 484 So.2d at 113. Based on the facts presented we find no error in the trial court's conclusion that the Bolco base is not unreasonably dangerous per se.
A product may also be unreasonably dangerous because of its design. The court in Halphen concluded that a product may be unreasonably dangerous because of its design for any one of the following reasons: (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility for the product, (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. Halphen, 484 So.2d at 115.
"Whether a product is defective because of its design is a question of fact, and a determination by a trier of fact on such fact will not be disturbed on appeal absent manifest error." Leday v. Aztec Corp., 544 So.2d 1249, 1251 (La.App. 3d Cir.), writ denied, 548 So.2d 335 (La.1989).
The plaintiff attempted to prove that less harmful alternative base designs existed at the time he was injured; however, this proof fell short of the necessary preponderance of the evidence. Many of the alternative bases which the plaintiff's expert discussed were unavailable at the time of this accident. Furthermore, plaintiff's evidence that the canvas strap-down base was an alternative base which would serve the same needs as the Bolco base with less risk of harm was not sufficient to establish that the Bolco base was unreasonably dangerous in design. The best plaintiff could *1285 offer with this alternative design was a trade-off of the types of injuries suffered. Although the plaintiff's expert testified that the injuries associated with the canvas strap-down base are less severe, he offered no factual basis for this opinion. Nor was evidence presented on the number of injuries associated with the canvas strap-down base versus the Bolco base. We find no error in the trial court's conclusion that the Bolco base was not unreasonably dangerous in design.
A product may also be unreasonably dangerous when the manufacturer fails to warn the consumer of dangers inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen, 484 So.2d at 115. An essential element of a cause of action based on failure to adequately warn of a product's danger is that there must be a reasonable relationship between the omission of the manufacturer and the injury. Bloxom v. Bloxom, 512 So.2d 839 (La.1987).[3]Compare Ingram v. Caterpillar Machinery Corp., 535 So.2d 723 (La.1988). In the present case Bolco instructed consumers on how to properly install the Bolco base and that if there were any gaps under the base, it was incorrectly installed. Bolco did not warn its consumers regarding the risks of injury if the base was not maintained level at all times, nor did it warn of what risks were involved when a base was incorrectly installed. Mr. Orsatti testified that he considered these risks obvious to the consumer and therefore not necessary. Furthermore, as stated above, every employee of BREC involved in field maintenance testified that he understood the risk of injury involved when a gap was left under the base, and that all maintenance crew employees were instructed to keep the bases flush. We can only conclude that Bolco's failure to warn of the consequences of not maintaining the base flush with the ground was an obvious hazard and one which was known by the persons responsible for maintaining the bases. Based on these facts we find no reasonable relationship between Bolco's failure to warn and the plaintiff's injury.
For the reasons set forth we affirm the trial court's judgment. Costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] BRASA is an organization independent of BREC, with its own officers and board of directors.
[2] BREC officials testified that the fees paid by BRASA covered the utilities and that BREC made no profit from the fees.
[3] Unlike the factual situation presented in Bloxom, the alleged defective warning in the instant case was not directed to softball players; it was directed to the purchasers of the bases, who were primarily municipal recreation associations.