619 So.2d 1089 (1993)
Vicki Lynn POLITZ
v.
RECREATION AND PARK COMMISSION FOR the PARISH OF EAST BATON ROUGE.
No. CA 92 0388.
Court of Appeal of Louisiana, First Circuit.
April 23, 1993.
Rehearing Denied June 28, 1993.
*1090 Celia R. Cangelosi, Baton Rouge, for plaintiff-appellant Vicki Lynn Poltz.
Helen N. Crouse, Baton Rouge, for defendant-appellee Recreation and Park Com'n for the Parish of East Baton Rouge.
Before EDWARDS, SHORTESS and WHIPPLE, JJ.
WHIPPLE, Judge.
Plaintiff, Vicki Lynn Politz, appeals the trial court's granting of a motion for involuntary dismissal in favor of defendant, the Recreation and Park Commission for the Parish of East Baton Rouge (BREC), at the close of plaintiff's case. For the following reasons, we reverse and remand.

PROCEDURAL HISTORY
Plaintiff was employed by Brothers' Ace Hardware, a business owned by her husband, Gregory Politz, and her brother-in-law, Jerry Politz. Plaintiff played on the coed, slow pitch softball team sponsored by Brothers' Ace Hardware. She and her husband acted as the team managers, and Carl Robichaux was the team's coach. The accident *1091 at issue occurred on the evening of September 17, 1986, when the Brothers' Ace Hardware team began play on Independence Park field number 3 at 8:30 p.m. Shortly after the game began, plaintiff injured her right knee while playing softball, when her foot slipped or landed in a hole concealed under second base.
On September 16, 1987, plaintiff filed suit against BREC for recovery of damages sustained in the accident. BREC is a public corporation established by the legislature with the authority to own, develop and administer public recreational and park facilities. LSA-R.S. 33:4570 et seq. BREC is solely responsible for maintenance and administration of field number 3 at Independence Park, the field on which plaintiff was allegedly injured.
Plaintiff alleges she was injured as a result of the negligence of BREC in failing to maintain field number 3 in a safe and reasonable manner and in failing to adequately warn plaintiff of the danger.
A bench trial was held on September 5, 1991. At the close of plaintiff's case, BREC moved for a judgment of involuntary dismissal. During the trial, the trial court questioned whether plaintiff could prove her case by the impeached testimony of BREC employees and eventually granted BREC's motion, dismissing plaintiff's case with prejudice. In the judgment signed September 17, 1991, dismissing plaintiff's case, the trial court stated that BREC had satisfied its duty under the law and that "plaintiff was 100% liable for her injuries."
Plaintiff then filed a motion for new trial and to amend the judgment, which was denied by the trial court. From these judgments, plaintiff appeals, contending the trial court erred in granting BREC's motion for involuntary dismissal and in denying her motion for a new trial.

TRIAL TESTIMONY
At trial, plaintiff testified she was playing the position of second base on the night of the accident. She stated after her team was out in the field during the first inning, the umpire told the players to be careful because second base was "loose" and that they were not required to touch the base. According to plaintiff, the umpire did not say "do not touch the base," but merely said that the players were not required to step directly on it, as customarily required in the game.
Plaintiff explained that the bases on the field at Independence Park were the type that have a shaft connected to the base and a stationary receiver in the ground, into which the shaft fits. Thus, when the umpire said the base was "loose," plaintiff interpreted this statement to mean that the base was wobbly on its shaft. Plaintiff did not personally inspect the base prior to the game, stating that as team manager, she would make the determination of whether an independent investigation was needed based on the umpire's explanation of the problem. She testified that she did not inspect the base at that time because based on her twenty years' experience in softball, she knew how to react around a base that was loose.
Plaintiff was injured when she ran to cover second base as the shortstop threw her the ball. Mrs. Politz stated as she was approaching the base, she remembered the umpire saying the base was loose. Accordingly, she attempted to run toward the edge of the base so that she would barely touch it. As she attempted to catch the ball, her foot touched either solid ground right next to the base or the base itself. She stated she felt her heel going straight down into a hole, felt a "big snap," and fell. She was unable to complete the game and had to be carried off the field. Thus, she did not see the base area after she fell.
Jeff Barron was playing shortstop position and witnessed the accident. Barron testified he pitched the ball to plaintiff to cover second base, and as she caught the ball, stepping to second base, the base bag slipped out from under her. According to Barron, the force of plaintiff's foot coming into contact with the bag caused the bag to slide two to three feet from where it was originally positioned.
*1092 Barron also examined the second base area after plaintiff's fall. In the place where the bag had originally been, he observed a hole which he described as six to nine inches wide and six inches deep, a "rather large" hole, with the base bag just covering the hole. Although two games had been played on field number 3 earlier that evening, Barron was of the opinion that runners sliding into second base in the two earlier games could not have caused a hole of this size to develop, although earlier play could have contributed to its size. He explained that he had been playing baseball throughout his life and had never seen a hole of this size under a base in ordinary play. He also noted nothing had been holding the bag secure and that there was a hole where the shaft should have been. Barron was "surprised" by what he saw as the second base had appeared to be normal and secure prior to plaintiff's accident.
Janis Durbin was playing third base on the night of plaintiff's injury and also testified. She also recalled the plate umpire telling the players second base was loose and that it would be "okay to tag runners anywhere near the base". Durbin testified the umpire did not tell the players they were not to step on the base, but that it would be "okay" if they did not.
Gregory Politz, plaintiff's husband, testified that prior to the game, the plate umpire told the players second base was loose and that they should just step near it, rather than on it. According to Mr. Politz, he then asked the umpire if there was another field available. Although there was another field not in use, the umpire responded that their game was scheduled for field number 3, and play commenced on field 3.
Jerry Politz, plaintiff's brother-in-law, was in the dugout at the time plaintiff was injured and observed plaintiff running toward second base to receive a throw. At or about the time she received the ball, her leg collapsed and she fell to the ground. He also examined the second base area after plaintiff fell and testified the base was six inches to one foot away from where its original location. He also saw the hole where the base had been located, which he estimated to be ten to twelve inches in diameter, cone-shaped, and four to five inches deep. While he had not heard any warning that night concerning a hole or other condition at second base, as related by plaintiff and her witnesses, he testified that on the Monday evening prior to the Wednesday night game in question, the umpire told him to be careful and just get close to second base because there was a problem with the base.
Mr. Politz stated he had checked the base and discovered a hole under the base. He testified the hole he saw after plaintiff's fall had the same appearance as the hole he had observed on Monday evening. Thus, he concluded, nothing had been done to correct or fill the hole between the Monday and Wednesday night games.
Plaintiff also called Gene McNabb, the BREC employee and scorekeeper during the game in question, and Claude McGee, the safety and training director for BREC at the time of her injury. McNabb testified he was employed on a part-time basis by BREC as a scorekeeper and was the scorekeeper during the game in which plaintiff was injured. McNabb remembered a problem with the second base which lasted for more than one night; however, he did not remember if the problem arose before or after plaintiff fell. McNabb also stated he did not remember giving a warning on the night plaintiff was injured, but that giving a warning would be the responsibility of the umpire and not the scorekeeper.
Mr. McGee testified that his job duties as safety and training director for BREC included maintaining and setting up safety procedures for the entire BREC operation, which included Independence Park ball fields. According to McGee, if a problem was detected on one of the fields, BREC tried to correct the problem prior to the game so that the game could be played as scheduled. If an unsafe condition was discovered, it should have been reported to him. If, however, the problem was not discovered until 8:30 in the evening, the problem should have been initially reported to the scorekeeper on the field. McGee *1093 explained that prior to beginning a game, the decision to cancel the game is controlled by the scorekeeper. Once the game begins, the decision to stop the game is controlled by the umpire. The umpire and scorekeeper were employed by BREC. However, McGee also stated that prior to the game, the scorekeepers and the coaches would generally check the field together, and the ball game could be called by either one of the coaches as well as the scorekeeper.
After prolonged questioning by plaintiff's counsel, McGee conceded that if BREC personnel knew that one of the bases no longer had a shaft attached to it so that it could not be secured, they should not allow the game to take place. According to McGee, BREC employees are instructed that if they see any condition that appears to be unsafe, they are not to allow the game to occur.
Plaintiff also introduced the deposition testimony of Dr. Richard Robichaux, Jr., plaintiff's orthopedic surgeon and treating physician. Dr. Robichaux first examined plaintiff for the right knee injury on September 22, 1986. The history related by plaintiff was that she had injured her knee while playing softball on September 17, 1986. Dr. Robichaux diagnosed plaintiff's condition as a torn medial meniscus. A few weeks later, he performed an arthroscopy on her right knee and removed part of plaintiff's medial meniscus. His post-operative diagnosis of plaintiff's condition was a bucket handle tear of the medial meniscus which he related to the accident. Dr. Robichaux opined that the accident described to him by plaintiff in which her knee buckled while playing softball more likely than not caused the tear of the medial meniscus for which surgery was required.

INVOLUNTARY DISMISSAL
In an action tried by the court without a jury, after the plaintiff has completed the presentation of her evidence, any party may move for a dismissal of the action on the ground that upon the facts and law, the plaintiff has shown no right to relief. LSA-C.C.P. art. 1672(B). The appropriate standard for the trial court's determination of a motion for involuntary dismissal is whether the plaintiff has presented sufficient evidence in her case-in-chief to establish a claim by a preponderance of the evidence. Tillotson v. Undisclosed Insurance Company, 486 So.2d 918, 920-921 (La.App. 1st Cir.), writ denied, 488 So.2d 1026 (La.1986). Proof by a preponderance of the evidence simply means that when taking the evidence as a whole, the fact or cause sought to be proved is more probable than not. Parr v. Kelly, 420 So.2d 1187, 1188 (La.App. 5th Cir.1982). In reviewing a trial court's ruling on a motion for involuntary dismissal, the appellate court should not reverse the trial court's ruling in the absence of manifest error. Tillotson, 486 So.2d at 921.
Plaintiff argues the trial court erred in granting the involuntary dismissal of her case. We agree.
In the maintenance and operation of its public parks, playgrounds and recreational areas, and the appliances therein and thereof, BREC owed a duty commensurate with ordinary and reasonable care under the circumstances. BREC is not the insurer of the safety of those making use of such facilities, nor is it required to eliminate every source or possibility of danger. Shipley v. Recreation and Park Commission for Parish of East Baton Rouge, 558 So.2d 1279, 1282 (La.App. 1st Cir.), writ denied, 565 So.2d 947 (La.1990). Rather, it is held to the same degree of care in the performance of its obligations arising from ownership as any other person in possession and control of land. Godfrey v. Baton Rouge Recreation and Parks Commission, 213 So.2d 109, 113 (La.App. 1st Cir.), writ refused, 252 La. 958, 215 So.2d 128 (1968).
This court, in Farr v. Montgomery Ward and Company, Inc., 430 So.2d 1141, 1143 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (La.1983), described the duty of the owner or person having custody of immovable property as follows:
The owner, or person having custody, of immovable property has a duty to keep *1094 such property in a reasonable [sic] safe condition. He must discover any unreasonably dangerous condition on his premises and either correct the condition or warn potential victims of its existence. This duty is the same under the strict liability theory of La.C.C. art. 2317 as under the negligent liability theory of La.C.C. art. 2315. The difference in proof between these theories of liability is that under La.C.C. art. 2315, it must be shown that the owner, or person in custody, either knew or should have known of the risk, whereas under La.C.C. art. 2317, a claimant is relieved of proving the defendant's scienter. Under either theory of liability, the plaintiff has the burden of proving that: (1) the property which caused the damage was in the "custody" of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises (breach of duty); and (3) that the defect in the property was a cause in fact of the resulting injury. In both negligent and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty. (Citations omitted.)
See also Crochet v. Freeman, 504 So.2d 1064, 1065-1066 (La.App. 1st Cir.1987).
The parties have not disputed that field number 3 at Independence Park was under the care and custody of BREC. In its answer, BREC admitted that it was "solely responsible" for the maintenance and administration of this field. Moreover, it is clear from the testimony of plaintiff and the witnesses who saw the accident that plaintiff's injury was caused when her foot went into the hole beneath second base. The preponderance of the evidence also supports a finding that BREC knew or should have known of the concealed hole at second base for at least two days prior to plaintiff's injury.
As we have previously recognized, the field surrounding second base should be maintained level and free of holes and depressions. Shipley, 558 So.2d at 1281. The evidence adduced during plaintiff's case-in-chief demonstrates that not only was there a concealed hole under second base, but also, the base was not connected to its shaft. Although the witnesses gave varying estimates of the size and depth of the hole, plaintiff clearly proved by a preponderance of the evidence there was a large hole concealed under second base.
Moreover, the evidence also demonstrates that the hole did not develop during the course of play that evening. Jerry Politz testified he had been warned by the umpire that there was a problem with second base two nights prior to the game in which plaintiff was injured. As his testimony shows, the hole he saw after plaintiff's fall appeared to be the same size as the hole he had observed during game play two evenings before. We conclude that plaintiff established by a preponderance of the evidence that a hole existed and that the risk of falling in the hole concealed under the unattached base presented an unreasonable risk of harm under the circumstances.
BREC argues it fulfilled its duty by issuing an adequate warning to the players prior to the game. However, as plaintiff correctly asserts in her brief, a warning that the base was loose could not have apprised her of the danger of stepping into a concealed hole under the unattached base. Plaintiff testified that because she had been warned the base was loose, she approached the edge of the base so as to avoid stepping directly on it. There is nothing in the record to support a conclusion that plaintiff stepped directly onto the base. She testified that as she ran toward the edge of the base, the base became dislodged from its position, exposing the hole into which her foot slipped. Thus, the precautions she took, although reasonably based on the warning she was given, could have contributed to the likelihood of injury because of the inadequacy of the warning.
*1095 The trial court concluded, however, that BREC had fulfilled its duty to the public. In oral reasons for judgment, the trial court stated:
They have been warned when they sign their roster that they're playing at their own risk. Everyone knows that physical sports are dangerous. They were warned before; they knew thisthere was a hole under that base on the Monday night before. If they wanted to move the game, they should have requested a field other than field three because they knew there was a hole under there. They knew it was still there. They knew there was something wrong with the base, with second base, before the game started. They had authority to call the game; she was the manager. They had authority to call the game.
* * * * * *
So I think that she was totally negligent. I think BREC carried their burdenwell, fulfilled their duty to the public. I grant the directed verdict.
Before an appellate court can disturb a factual finding of the trial court, it must determine that the finding is manifestly erroneous and has no factual basis. Manifest error has been defined as a finding of fact which is not reasonably supported by credible evidence in the record. Clifton v. Liner, 552 So.2d 407, 411 (La. App. 1st Cir.1989).
Although a plaintiff is entitled to no special inferences in his favor, uncontroverted testimony should be taken as true to establish a fact for which it is offered absent circumstances in the record casting suspicion on the reliability of the testimony and a sound reason for its rejection. Fuller v. Wal-Mart Stores, Inc., 519 So.2d 366, 369 (La.App. 2nd Cir.1988).
There is nothing in the record to support a finding that plaintiff had knowledge of the hole beneath second base prior to her accident or that she landed directly on the base. Although plaintiff's brother-in-law had discovered the hole under second base two nights prior to plaintiff's injury after being informed of a problem with the base, the trial court erred in imputing this knowledge to plaintiff. Thus, the trial court manifestly erred in concluding that BREC had adequately warned plaintiff of the defective condition at second base and had fulfilled its duty of reasonable care owed to plaintiff. This conclusion was tainted by the trial court's erroneous finding that plaintiff was made aware of the hole under the base prior to her injury, a finding not reasonably supported by credible evidence in the record. Clifton, 552 So.2d 407.
Based on the evidence, we find that plaintiff proved by a preponderance of the evidence that the defective area of second base presented an unreasonable risk of injury to her and that the warning given by BREC that the base was "loose" was insufficient to place her on notice of this defect.
We further note that the trial court's oral reasons for judgment indicate that it may have defined BREC's initial duty by what it perceived as plaintiff's negligence. In its reasons for judgment, the trial court discussed plaintiff's knowledge and actions and then concluded that BREC had fulfilled its duty. In addition to stating that plaintiff was aware of the hole prior to the game, the trial court also stated: "They have been warned when they sign their roster that they're playing at their own risk. Everyone knows that physical sports are dangerous."
A court may not define the defendant's initial duty in terms of the plaintiff's actual knowledge, and thereby achieve the same result which would be reached if assumption of the risk were still a valid defense in Louisiana, operating as a total bar to plaintiff's recovery. A defendant's duty does not turn on a particular plaintiff's state of mind, but instead is determined by the standard of care which the defendant owes to all potential plaintiffs. The determination of the plaintiff's knowledge regarding the risk of injury is made after fault on the part of the defendant has been established and is governed by the comparative fault principles enunciated in LSA-C.C. art. 2323. Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1136 (La.1988).
*1096 Although plaintiff's recovery may be limited by her comparative fault, we conclude that the trial court's erroneous finding that plaintiff had prior knowledge of the hole under second base also taints its finding that plaintiff was "100% liable" or "totally negligent" in regard to her injuries.
Because we have found the trial court erred in granting defendant's motion for involuntary dismissal, we need not address plaintiff's contention that the trial court erred in denying her motion for a new trial.

DECREE
The judgment of the trial court granting defendant/appellee's motion for involuntary dismissal is reversed and the case is remanded for further proceedings consistent with the views expressed herein, including completion of the trial.
Costs of this appeal in the amount of $741.29 are assessed against appellee, Recreation and Parks Commission for the Parish of East Baton Rouge.
REVERSED AND REMANDED.