680 So.2d 1333 (1996)
Randal SALLIS, et al., Plaintiffs-Appellees,
v.
The CITY OF BOSSIER CITY, Louisiana, et al., Defendants-Appellants.
No. 28483-CA.
Court of Appeal of Louisiana, Second Circuit.
September 25, 1996.
*1335 Deutsch, Kerrigan & Stiles by Robert E. Kerrigan, Jr., New Orleans, Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for Defendants-Appellants City of Bossier City and American Guarantee & Liability Ins. Co.
Mayer, Smith & Roberts by Alex S. Lyons, Shreveport, for Defendants Don W. Farrar, NSA & Transamerica Ins. Co.
Gordon Bartage, Shreveport, Sutton & Sutton by Bobby D. Sutton, Sr., Shreveport, for Plaintiffs-Appellees Randal and Gail Sallis.
Before MARVIN, C.J., and HIGHTOWER, BROWN, GASKINS and CARAWAY, JJ.
BROWN, Judge.
Plaintiff, Randy Sallis, injured his knee while participating in a softball tournament at a recreational complex owned and maintained by defendant, the City of Bossier City. The trial court found that plaintiff's injuries were caused by the City's negligence and that plaintiff and his wife were entitled to damages. We amend the trial court's judgment concerning cost of retraining and as amended, affirm.

Facts
The National Softball Association ("NSA") sponsored the 1991 Rose Classic Softball Tournament played on May 18-19 at Tinsley Park, a recreational facility owned and operated by the City of Bossier City ("the City"). Plaintiff, Randy Sallis, played in the tournament on a team sponsored by Big Star Grocery Store of Many, Louisiana.
Tinsley Park had four softball fields, two with grass infields (fields 3 & 4) and two with dirt infields (fields 2 & 5). All four fields were used on Saturday, May 18th, the first day of the tournament. Because of heavy rain on Saturday, Billy Walden, the supervisor at Tinsley Park, told Don Farrar, NSA regional director, that the grass fields could not be used on Sunday. The rain continued on Sunday and before play started, Walden "dragged" the two dirt fields with a tractor and scarifier.
Plaintiff's team played the fourth or fifth game on field 2 on Sunday. Plaintiff batted tenth in the lineup and on his first at bat hit a ground ball between first and second bases. The second baseman's attempt to throw plaintiff out was wide causing the first baseman to lean toward home plate to catch the ball. To avoid a collision, plaintiff slid headfirst into first base. During the slide, five feet from first base, plaintiff struck a steel shaft permanently fixed in the base path which ripped open his knee. Plaintiff was taken by ambulance to Willis-Knighton South Hospital.
On May 8, 1992, plaintiff and his wife, Gail Sallis, filed suit against the City and its insurer, American Guarantee & Liability Insurance Company. An amended petition named as additional defendants the NSA, its regional director, Don Farrar, and their insurer, Transamerica Insurance Company.
Trial began on December 13, 1994, and at the close of evidence, the trial court dismissed all claims against NSA, Farrar and Transamerica. Judgment in plaintiffs' favor was rendered on July 20, 1995. Randy Sallis *1336 was awarded general and special damages and Gail Sallis was awarded damages for loss of consortium.
The City and its insurer have appealed, alleging that the trial court erred in imposing liability and alternatively, that the trial court erred in awarding excessive damages. Appellants also assert that the trial court erred in failing to assess some portion of fault to the dismissed defendants. The Sallises answered the appeal, seeking an increase in damages.

Discussion

Fault Assessment
In the maintenance and operation of its public parks, playgrounds and recreational areas, a city/parish owes a duty commensurate with ordinary and reasonable care under the circumstances. Politz v. Recreation and Park Commission for the Parish of East Baton Rouge, 619 So.2d 1089 (La. App. 1st Cir.1993). The city/parish is not the insurer of the safety of those using such facilities, nor is it required to eliminate every source or possibility of danger. Pool v. City of Shreveport, 607 So.2d 861 (La.App. 2d Cir.1992); Politz, supra; Shipley v. Recreation and Park Commission for the Parish of East Baton Rouge, 558 So.2d 1279 (La. App. 1st Cir.1990), writ denied, 565 So.2d 947 (La.1990). Rather, it is held to the same degree of care as any other person or entity in possession and control of land. Politz, supra; Godfrey v. Baton Rouge Recreation & Parks Commission, 213 So.2d 109 (La. App. 1st Cir.1968), writ refused, 252 La. 958, 215 So.2d 128 (La.1968).
The owner or custodian of immovable property has a duty to keep the premises in a reasonably safe condition. Tugger v. Continental Casualty Insurance Company, 27,047 (La.App. 2d Cir. 06/21/95), 658 So.2d 769. He must discover any unreasonably dangerous condition on the premises and either correct that condition or warn potential victims of its existence. Bradford v. Louisiana Downs, Inc., 606 So.2d 1370 (La.App. 2d Cir.1992).
Plaintiffs premised this action against the City on both negligence and strict liability. The elements that must be satisfied to impose liability on the City are essentially the same under either theory. Oster v. Dept. of Transportation and Development, State of Louisiana, 582 So.2d 1285 (La.1991); Lutz v. City of Shreveport, 25,801 (La.App. 2d Cir. 05/04/94), 637 So.2d 636.
Under either negligence or strict liability, it must be shown that: (1) the City owned or had custody of the thing which caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; (3) the City had actual or constructive knowledge or notice of the defect prior to the accident and failed to take corrective action within a reasonable time; and (4) causation. Lutz, supra; Valet v. City of Hammond, 577 So.2d 155 (La.App. 1st Cir.1991).
The City's ownership and custody were not disputed and the evidence clearly establishes that plaintiff's injuries were caused by his striking a steel shaft hidden in the base path. We must therefore determine whether plaintiffs showed that the steel shaft presented an unreasonable risk of harm and that the City had knowledge of the defect prior to the accident.
Billy Walden, maintenance supervisor with the City's Parks and Recreation Dept., stated that Bolco base anchors were installed in the softball fields at Tinsley Park. The base anchor is one method of securing base pads to the ground; other methods of attachment include straps, side stakes and permanent installation. Because several of the base anchors had been bent by players sliding into base and by City employees when dragging and raking the fields, they were replaced with stakes of heavier gauge metal in 1990.
Because of a variety of baseball and softball leagues using different field dimensions, the City installed three permanent sets of base anchors on each field at distances of 60, 65 and 70 feet. The hollow steel shafts were set in concrete and covered with approximately two to three inches of dirt. Use of one set thus necessarily involved non-utilization of the other two sets.
Walden stated that when not in use, a thick mushroom-shaped rubber cap five *1337 inches in diameter was placed on the top of each unused base anchor. The caps served dual purposes; they kept mud and dirt out of the hollow shafts and prevented injury to players.
Although Tinsley Park was rented out to NSA for the softball tournament, maintenance of the fields remained the responsibility of the Parks and Recreation Dept. Because of the heavy rains on Saturday, the grass infields were being damaged. Walden informed Farrar, the tournament director, that no further games would be played on the two grass fields.
The tournament, however, was allowed to continue on the two dirt fields. Walden and his crew dragged these fields with a tractor and spiked attachment before any games began on Sunday. According to Walden, all that this accomplished was to "push the mud around." Walden stated that he did not check to see whether the protective rubber caps had been displaced and whether the anchor shafts were exposed during the previous day's games or as a result of his efforts to maintain the fields. He also testified that he did not inform any of the tournament officials or participants of the hidden and unused anchors in the base paths.
It is common and customary for softball to be played in the rain and mud. On this weekend, the fields were extremely muddy and base running was more difficult. Billy Walden and Don Farrar discussed implementing a "no slide" rule; however, the umpires, coaches and players were never notified of such a regulation. Charlie Mason and Larry Hattaway, who played on plaintiff's team, observed several players sliding in the game before theirs on Sunday.
Both Mason and Hattaway witnessed plaintiff's accident. According to his teammates, Randy dove towards first base to avoid a wide throw from the second baseman. All of a sudden, Randy began screaming. Mason ran out onto the field and when he turned his injured teammate over, he saw that Randy's knee had been torn open.
Mason and Hattaway observed that Randy struck a metal base anchor in the running path approximately five feet in front of first base. Both were unequivocal that the steel shaft did not have a protective rubber cap. Neither Walden nor Bob Carter, an employee of the Parks and Recreation Dept. who witnessed the accident, could remember whether the protective rubber cap was in place.
The City's installation of multiple sets of base anchors allowed for the easy adaptation of the park's fields for use by a number of baseball and softball leagues. Defendants, however, introduced no evidence of similar multiple base peg use in other recreational complexes or information concerning the safety of this type of installation. All of the witnesses, including the NSA regional director, testified that they were unaware that Tinsley Park was equipped with more than one set of base pegs.
The evidence clearly supports the trial court's finding that the steel shaft causing plaintiff's injury did not have its rubber covering and was hidden from view just below the dirt/mud. Given that softball is commonly played in the rain, that play in inclement weather softens the soil and tears up the field, that tournament play on a wet, muddy field causes excessive wear and tear to the field, we find that the unprotected and hidden steel shaft located five feet in front of first base constituted an unreasonable risk of harm.
Appellants' argument that the City was unaware of the hazard posed by the unprotected base peg is meritless. The base anchors were installed by City employees. There was a conscious decision by the City to install not one, but three pegs at different distances for each base on each field. In addition to the City's awareness of the presence of multiple base anchors, we find that the City knew or should have known that these base pegs, if unprotected, posed an unreasonable risk of harm and that it failed to implement a procedure to insure that each unused shaft was covered.
As noted previously, utilization of one set of base anchors required the nonuse of two sets of metal stakes. These stakes were located in the base path and supposedly covered with a protective cap and two to three *1338 inches of dirt. City employees whose responsibilities included maintenance of the fields at Tinsley Park testified that they occasionally struck or ran over the base anchors while mowing and grading the fields. On the date of plaintiff's accident, Walden tried unsuccessfully to grade the field where the injury occurred. According to Walden, all that he accomplished was rearranging the mud.
The officials, coaches and players were not informed of the presence of the additional base anchors, nor were the base anchors at 60 and 70 feet checked to ascertain whether the weather, maintenance efforts or tournament play had uncovered the unused stakes or dislodged their protective coverings.
As stated above, the trial court correctly found that the City was negligent and that this negligence caused plaintiff's injuries.

Involuntary Dismissal of Co-defendants
We now address defendants' contention that the trial court erred in granting a motion for involuntary dismissal filed by co-defendants, NSA, Don Farrar and Transamerica Insurance Company.
In an action tried by the court without a jury, after plaintiffs have completed the presentation of their evidence, any party may move for dismissal of the action on the ground that upon the facts and law, plaintiffs have shown no right to relief. La.C.C.P. Art. 1672(B). In reviewing the trial court's ruling on a motion for involuntary dismissal, the appellate court should not reverse the trial court's ruling absent manifest error. Politz, supra.
Following presentation of plaintiffs' case, NSA, Farrar and Transamerica moved for involuntary dismissal of all claims against them. Finding that plaintiffs failed to establish that NSA or Farrar had knowledge of the alleged premises defect, the trial court granted co-defendants' motion.
In this case, the dangerous condition was an unprotected base anchor located five feet in front of first base. The testimony is uncontroverted that Farrar, NSA's representative, was unaware that there were base pegs in the base line of the Tinsley Park fields. Furthermore, Billy Walden, Tinsley Park supervisor, testified that he never told anyone from NSA that there were base anchors in the base paths.
There was no evidence that NSA or Farrar was aware of the dangerous condition, i.e. an unprotected base anchor in the base line; thus, they had no duty to plaintiff to prevent his injury. We also find no merit to defendants' assertion that NSA and Farrar were negligent for failing to terminate tournament play because of the inclement weather. Plaintiff's injuries were caused not by his playing softball on a muddy field, but by sliding into an unprotected stake located a few feet in front of the base. The trial court correctly granted co-defendants' motion for involuntary dismissal.

Damages

General Damages
Appellants argue that the trial court's general damage award of $300,000 is excessive and should be reduced to $100,000. Appellees assert that the trial court's award is inadequate and should be increased to $350,000.
General damages involve mental or physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which can not be definitively measured in monetary terms. Keeth v. State Through Dept. of Public Safety and Transportation, 618 So.2d 1154 (La.App. 2d Cir.1993); Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La.App. 2d Cir.1990), writ denied, 573 So.2d 1135 (La.1991).
The discretion vested in the trier of fact is vast and an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Rick v. State, Dept. of Transportation and Development, 93-1776 (La.01/14/94), 630 So.2d 1271; Youn v. Maritime Overseas *1339 Corp., 623 So.2d 1257 (La.1993), cert. den. sub. nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The injuries incurred by plaintiff, who was 30 years old at the time of the accident, were severe and have resulted in permanent disabilities. Following the accident, plaintiff was taken by ambulance to Willis-Knighton South. Dr. Marion Milstead noted that plaintiff had sustained a complex transverse laceration of the right knee, with a puncture gouge wound on the underside of the knee. The open wound and inside the knee joint were contaminated with mud. Plaintiff had extensive damage to his medial and quadriceps tendons and patella.
Between May 19-21, three surgeries were performed by Dr. Milstead on plaintiff's knee. Following his discharge on May 25, plaintiff was confined to bed for six weeks and received physical therapy on a Continuous Passive Motion Machine. Approximately four weeks post-injury, plaintiff began experiencing foot numbness and lower back tenderness and spasm.
Dr. Austin Gleason treated plaintiff for his back injury. According to Dr. Gleason, plaintiff injured some nerves in his lower back and plexus and this caused numbness and nerve weakness in plaintiff's leg. Because of the nature of plaintiff's injury and resulting disability, his gait was affected.
Plaintiff progressed from using a wheelchair, to a walker, to crutches, and finally, by September 1991, he was able to get around with the assistance of a cane. Plaintiff returned to work at South Central Bell approximately eight weeks after his accident. Prior to his accident, plaintiff was employed as an Outside Plant Technician (OPT); this job required him to climb telephone poles, replace cable and splice terminals. Because his injuries prevented him from returning to work as an OPT, South Central Bell implemented temporary accommodations for plaintiff.
Dense fibrous adhesions and granular bursae, sacs or cavities containing fluid, formed and plaintiff developed ankylosis, limited range of motion of the knee. A fourth surgery to remove the adhesions and cavities was performed by Dr. David Waddell on August 7, 1991. Dr. Waddell advised plaintiff that even with a successful surgery, there was a significant chance that he would never regain full motion of his knee and would experience a permanent popping or grinding in the joint. According to Dr. Waddell:
Basically, the joint was totally obliterated... A good analogy would be if you just poured some super glue or gook ... and filled up a sack that you had that was supposed [to be] aa sack blown up with air ... and just filled it up with a thick globular tissue, and that's what happened, and that's why he couldn't move his knee past the restraints that he'd reached.
Plaintiff continued to experience pain and limited range of motion and a fifth surgery to remove excess scar tissue and permanent stitches was performed on December 3,1992.
Plaintiff was diagnosed with chondromalacia, or degenerative, posttraumatic injury to the underside of his knee cap, which was caused by a combination of the open nature of his injury and his physical rehabilitation. Further, plaintiff now has an altered gait, which is a source of intermittent pain, and he continues to experience numbness in his toes, foot and calf because of irreparable nerve damage. As a result of his accident, plaintiff has a 15% disability of his right leg and an 8-10% whole body disability.
Permanent physical limitations imposed upon plaintiff by his doctors include no climbing, squatting or lifting from a squatting position; no lifting of things weighing over 75 pounds; no walking on uneven or unlevel terrain; and no stair, pole or ladder climbing.
Prior to his accident, plaintiff had an active, outdoor, athletic lifestyle. He is no longer able to enjoy such activities as hunting, fishing and playing softball and basketball. Once an avid runner, plaintiff can now only jog slowly wearing padded shoes. Plaintiff stated that he can no longer participate in physical activities with his children and friends.
Because of the physical restrictions imposed upon plaintiff, the temporary accommodations made by plaintiff's employer have *1340 been deemed permanent. Plaintiff's supervisor, Henry Short, testified that plaintiff's disabilities will prevent him from both promotions and lateral transfers.
Plaintiff stated that he had a hard time accepting his physical limitations and disabilities and that he suffered from stress at work because he was worried about whether he would even have a job, where it would be and whether he would be able to earn as much as he did before the accident. With professional counseling, however, he was able to accept his changed lifestyle.
Although not controlling, two cases are instructive concerning high and low awards for similar injuries.
In Morales v. Tetra Technologies, 608 So.2d 282 (La.App. 3d Cir.1992), a $334,000 general damage award for a knee injury requiring two arthroscopic surgeries with permanent disability was affirmed, with the court stating:
Although the award for general damages may be on the high side, we cannot say it is an abuse of discretion based upon the testimony and the record.
Morales, 608 So.2d at 286.
Richard v. St. Paul Fire and Marine, 94-2112 (La.App. 1st Cir. 06/23/95), 657 So.2d 1087, involved a knee injury with three incision procedures and permanent disability. A jury award of $125,000 in general damages was affirmed. The court stated:
We cannot say that $125,000 was lower than a reasonable person could have awarded in this case. While some might consider it low in light of the significant complications Richard's suffered, it is not shockingly low. Reasonable minds differ on compensation which should be awarded for an injury.
Richard, 657 So.2d at 1092.
These two cases suggest a range within the trial court's discretion. In the instant case, plaintiff had five surgeries with permanent disability. He wants to work and certainly is not a malingerer. His injuries are real. He likely will need to have a knee replacement in the future. Although some would be less compassionate, we view the trial court's award of $300,000 to be within its discretion.

Loss of Earning Capacity
Appellants contend that the trial court erred in awarding plaintiff damages for loss of earning capacity and cost of retraining because plaintiff returned to his pre-injury employment. Appellees urge that the trial court's award of $284,000 ($200,000 for loss of earning capacity and $84,000 for cost of retraining) is inadequate.
An award for lost earning capacity encompasses the loss of one's potential, that is, the loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience. Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711 (La.App. 2d Cir.1991).
The factors to be considered by the fact finder in determining loss of earning capacity include the plaintiff's physical condition before and after his injury; his age and life expectancy; his work record and previous earnings; the amount plaintiff probably would have earned absent his injury; and the probability that he would have continued to earn wages over the balance of his working life. Laing v. American Honda Motor Company, 628 So.2d 196 (La.App. 2d Cir.1993); Keeth v. Dept. of Public Safety & Transportation, 618 So.2d 1154 (La.App. 2d Cir.1993).
Other considerations include whether and for how long plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury and whether plaintiff has been disabled from work for which he is fitted by training and experience. Laing, supra; Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir.1988).
Because loss of earning capacity can not be calculated with mathematical certainty, the fact finder is accorded great discretion in making such an award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); DeRouen v. Audirsch, 25,847 (La. App. 2d Cir. 06/28/94), 639 So.2d 476. Only if an award is abusively low or high may this *1341 court modify and then only to the extent of raising or lowering the figure to the lowest or highest sum within the discretion of the trial court. Hobgood, supra; Thomas v. Petrolane Gas Service Ltd. Partnership, 588 So.2d 711 (La.App. 2d Cir.1991).
Prior to his injury, plaintiff was employed as an OPT with South Central Bell. His job duties included climbing telephone poles to replace cable and splice terminals. Plaintiff returned to work approximately eight weeks post-injury. Temporary accommodations were made and plaintiff worked at a desk as a relieving supervisor until August 1993. Thereafter, he returned to his prior unit, which permanently accommodated his disability; however, little hope existed for lateral transfers or promotions.
Plaintiff's supervisor, Henry Short, acknowledged that plaintiff was able to continue working for South Central Bell solely because of accommodations made in accordance with his physical restrictions. Short also stated that because of his disabilities and lack of a college degree, plaintiff will not be able to move up from his current position.
Short explained to the court that South Central Bell has a five year plan for reduction of its work force. The plan calls for layoffs based on seniority. Short has four OPTs under his supervision and plaintiff is the one with the least seniority. In an inverse seniority cutback, plaintiff will be the first to be let go unless he can make a lateral move.
Plaintiff testified that his disabilities and physical restrictions kept him from a lateral transfer in the summer of 1993. Plaintiff believes that it is inevitable that he will be laid off and will be unable to find other employment because of his disabilities.
Because the other OPTs working with plaintiff did all the climbing, plaintiff was able to stay on the ground and continue to work. Plaintiff earned $34,000 in 1990; $42,200 in 1991 (the year of his accident); $56,000 in 1992; and $54,000 in 1993. These increases in 1992 and 1993 were due to plaintiff working an average of 800 hours a year in overtime. In 1993, however, plaintiff's employer announced a serious cutback in personnel which will continue through 1998.
Plaintiff attended college for a year, pursuing a degree in physical education, before going to work in the blue collar sector. All of plaintiff's jobs have involved physical labor. According to Dr. Richard Galloway, certified rehabilitation counselor, plaintiff's ability to be retrained for other positions is enhanced by his high level of intelligence. However, Dr. Galloway noted that plaintiff has limited vocational skills. Because of his injuries and medical restrictions, the type of work plaintiff can perform has been drastically reduced. Although plaintiff's employer has made accommodations for him pursuant to the Americans with Disability Act (ADA), plaintiff has nonetheless lost earning potential and job security as a result of his accident.
Dr. Melvin Harju, economist, testified as to the probability that plaintiff would lose his job in the future when South Central Bell downsized because of his lack of seniority and his disabilities. Dr. Harju calculated six possible scenarios to reflect plaintiff's lost earning capacity. These figures range from $178,976 to $1,300,000, depending on whether and for how long plaintiff remains with his current employer and whether plaintiff pursues further training or education. Dr. Harju also noted that should plaintiff continue his current employment, he would suffer no lost earnings and thus no economic loss.
Based on the evidence, the trial court found that plaintiff's layoff or termination, though uncertain, was likely. A believable expert opinion together with plaintiff's supervisor's testimony that plaintiff's job was in jeopardy, provided a rational basis for the trial court's decision. The trial court used loss scenario # 5 ($248,003), which Dr. Harju testified was the most likely to occur, and split the difference between it and loss scenario # 6 ($178,976), for an award of $200,000.
This court stated in Killough v. Bituminous Casualty Corp., 28,329 (La.App. 2d Cir. 05/18/96), 674 So.2d 1091:
The Louisiana Supreme Court has gravitated to the nebulous concept of loss of earning capacity, and little evidence is required *1342 to trigger the application of the discretion of the trial court, now so vast that there is little room for adjustment on the appellate level. Williams v. City of Monroe, 27,065 (La.App. 2d Cir. 07/03/95), 658 So.2d 820, writs denied, 95-1998, 95-2017 (La. 12/15/95), 664 So.2d 451, 452.
Keeping in mind the trial court's great, even vast discretion in determining damages, we cannot say that the award of $200,000 for lost earning capacity was an abuse of discretion.
However, we find no support in the record for the trial court's award of $84,000 for cost of retraining. Dr. Galloway testified that the estimated cost of three years of college (tuition and books) is $9,000. We thus amend the judgment and reduce the award for cost of retraining to $9,000.

Decree
IT IS ORDERED, ADJUDGED AND DECREED that plaintiff is awarded $9,000 for cost of retraining.
IT IS FURTHER ORDERED that in all other respects the trial court's judgment is AFFIRMED.
All costs are assessed to defendants/appellants, City of Bossier City and American Guarantee & Liability Insurance Company. AS AMENDED, AFFIRMED.
HIGHTOWER and CARAWAY, JJ., dissent in part with written reasons.
HIGHTOWER, Judge, Dissenting In Part.
On this record, I concur in the determination of liability; however, the damage awards affirmed by the majority are clearly abusive.
For reasons somewhat similar to those expressed in Judge Caraway's dissent, I find $75,000 to be the highest amount that should appropriately be granted for any loss of earning capacity by plaintiff.
With respect to Sallis's general damages, I am convinced that $150,000 constitutes the highest sum that should be affirmed. For awards concerning comparable leg injuries, see, e.g., Crow v. Rambin, 569 So.2d 246 (La.App. 2d Cir.1990) (reducing award to $62,000 for a twenty percent disabled right leg); Blakeney v. Tidewater, 463 So.2d 914 (La.App. 2d Cir.1985), writ denied, 467 So.2d 535 (La.1985) (award fixed at $70,000 where two surgeries resulted in kneecap removal, an inability to return to part-time construction work, a thirty percent disability to the leg, and the knee stiffening upon walking, squatting, etc.); Stephens v. Town of Jonesboro, 25,715 (La.App. 2d Cir. 08/19/94), 642 So.2d 274, writs denied, 94-2351, 94-2557, 94-2577 (La. 11/29/94), 646 So.2d 400 ($100,000 affirmed for a twenty percent disabled leg and other injuries, while awarding $300,000 to another individual much more seriously injured than our present plaintiff); Richard v. St. Paul, 94-2112 (La.App. 1st Cir. 06/23/95), 657 So.2d 1087 ($125,000 for knee injury with "unusually severe complications," three surgeries, and an inability to do manual work); Cormier v. Cliff's Drilling, 93-1260 (La.App. 3d Cir. 05/04/94), 640 So.2d 552 ($165,000 granted for four surgeries and permanently partially bent knee producing persistent pain, and inability to squat, climb, etc.).
Accordingly, I dissent in reference to both awards.
CARAWAY, Judge, dissents in part with written reasons.
CARAWAY, Judge, dissenting in part.
I respectfully dissent regarding the majority's award for lost future earnings and retraining.
The plaintiff's claim for loss of future earning capacity in this case was presented in the face of one glaring fact. In each of the two years following his 1991 accident, while remaining in his same job, plaintiff earned on average 62% more in wages than he did in 1990, the year before his accident. From that fact and the testimony presented at trial as analyzed below, I dissent from the majority's award of $209,000 for retraining and lost future earnings.
Compensation for the loss of future earning "capacity" does not require proof of one's actual loss of wages after the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Nevertheless, the fact that this plaintiff has continued to excel in his company as a model employee with an extraordinary work ethic *1343 ironically makes the majority's award of $209,000 in damages for lost capacity exorbitant in my opinion. At the time of the trial of the case, some three and one-half years after the accident, no actual loss of wages due to the alleged lost capacity had accrued whatsoever since Mr. Sallis remained employed at South Central Bell (SCB). Indeed, at the time of the recent oral argument, plaintiff's counsel informed the court that plaintiff's employment continued. Therefore, bearing in mind that the calculation process for future earnings loss employed by plaintiff's expert economist utilized the concept of the time value of money, the plaintiff's immediate investment return from the majority's award of $209,000 plus legal interest will provide him with a windfall well in excess of one-half of his $34,000 yearly salary at SCB without any "loss" or "damage" having yet begun to accrue.[1]
The analyses of Dr. Galloway and Dr. Harju identified the predicament in which the plaintiff will find himself if he loses his job with SCB, a major national corporation providing plaintiff with the highest quality wage and benefits. If he loses that job and remains in the skilled-labor market, he will likely be able to be re-employed at a wage rate of $8.50 per hour or one-half of his present wage at SCB. If he loses his job and returns to college, he will suffer the expense of three years of lost wages and the cost of schooling, and he will return to the job force at $25,000 per year instead of his present base salary of $34,000. Nevertheless, this predicament, whether he chooses the college route or the skilled vocational route, existed for this plaintiff with or without his injury because of what Dr. Galloway described as his "limited transferable skills" and his "limited vocational history." In other words, stated in terms of causation, the plaintiff's knee injury has not caused a deprivation of any significant capacity[2] to find other skilled, vocational jobs or of his intellectual capacity which may be expanded in college.
The focus thus becomes whether Mr. Sallis will suffer economic consequences in the narrow context of his present job either by the early loss of that job because of the injury or by his inability to obtain higher wages in the company. In this regard, the evidence establishes that because of his injuries, plaintiff's ability to move laterally within his company has been limited. However, there was no evidence that this limitation has in any way increased plaintiff's chances of being laid off or terminated by South Central Bell, though it would limit his ability to transfer to other positions within the company. As for higher paying positions, plaintiff's supervisor testified that a college degree is required for such jobs and that with a degree, plaintiff's job security, status and ability to earn higher wages at South Central Bell would be enhanced.
Because of the lack of evidence that plaintiff's injury will cause a termination of his employment with SCB, Dr. Harju was forced to rely upon a statistical analysis applicable to all 34-year old men in the work force to demonstrate what Dr. Harju termed as the "probability of continuous employment." This analysis is based upon the 5% chance that a 34-year old will lose his job in the present year. Repeating this percentage year-to-year yields a "contingent probability" that after 15 years, is greater than 50%. Unable to demonstrate that the plaintiff will lose his job because of his injury, the thrust of Dr. Harju's testimony was based upon this sterile statistical analysis divorced from the *1344 reality of plaintiff's model employee performance which still continues with SCB, unaffected by his injury.[3]
The majority's statement that the trial court found plaintiff's layoff "likely" because of his injury is nowhere reflected in the record, ignores the premise of Dr. Harju's testimony and misstates the court's actual ruling. With the lack of evidence that plaintiff's injury will probably cause a layoff from SCB and with only Dr. Harju's statistical speculation, the trial court's actual ruling regarding its $200,000 award for lost future wages was:
"The projections of the expert relative to loss of wages was discounted by the court slightly on account of the uncertain nature of any layoff/ termination as per evidence adduced at trial." (Emphasis supplied.)
Nevertheless, plaintiff's inability to move laterally in the company and, as noted above, the further testimony that a portion of the skilled labor market is unavailable to plaintiff, does mean that the plaintiff has lost some employment capacity that might be compensable despite its insusceptibility of precise measurement. C.C. art. 1999. In other words, this is not a case where the evidence showed that the plaintiff was employable before the accident at numerous jobs paying $10 per hour but now can earn only $6 per hour so that his damages are more precisely measurable. The difficulty in applying precise measurement to this plaintiff's loss of capacity nevertheless does not mean the trial court's discretion was open ended. Certainly the present award which will now allow the plaintiff to draw well over 50% of his $34,000 salary from the earnings from such award bears no rational relationship to his harmed lateral mobility.
Another case where the harm to the plaintiff's employment capacity was difficult to measure was our recently decided case of Killough v. Bituminous Casualty Corp., 28,329 (La.App. 2d Cir. 05/18/96), 674 So.2d 1091. In that case, a ten year old suffered a partial amputation of his foot. Like the plaintiff, he will not have available to him many manual/skilled labor jobs. Unlike the plaintiff, he was obviously not employed nor in the 97th percentile of intelligence. He had no existing job-related data by which to partially gauge his future loss, and he had his entire work life before him. The trial court awarded $36,500 for lost earning capacity and disability, which we affirmed. In this case where the plaintiff's injury will have no bearing on the plaintiff's existing wages at SCB, which have actually increased by 62%, the $209,000 award of the majority is unsupportable.
This case presents an interesting contrast between the trial court's award for pain and suffering and the award for lost future wages. Because of the vast discretion of the trial court, I join the majority in affirming the general damage award though the award can certainly be viewed at the highest end of the scale. Unlike the award for pain and suffering, the award for lost future wages must be set within more specific parameters which must demonstrate more than mere speculation about the future. Though this plaintiff may lose his job with SCB in the future and suffer economic consequences, this record demonstrated to the trial court and to me that the cause for the potential job loss is far too "uncertain" to be linked to plaintiff's injury and thus compensable to the extent of the huge award of the majority.
NOTES
[1] At an investment rate of 8.5% on $209,000, the plaintiff would be assured a return of approximately one-half of his $34,000 per year salary. Though legal interest will be employed in this case from May, 1992 which will increase this award significantly, the purpose of such interest, which is to compensate for "damages due to delay in the performance of an obligation to pay money" is altogether absent in this instance since, unlike other tort damages, any monetarial loss which plaintiff may suffer still lies in the future. Former C.C. Art. 1935 (1870) and La. C.C. art. 2000.
[2] Dr. Galloway testified that approximately 10% of the universe of skilled vocational jobs would be unavailable for the plaintiff due to the physical limitations caused by his injury. Nevertheless, he testified that plaintiff would be able to be retrained for a skilled job and could find such job paying approximately $8.50 per hour. He did not indicate that without the knee injury, plaintiff could expect a re-entry wage higher than $8.50.
[3] After demonstrating statistically that plaintiff will lose his job in 15 years, the remainder of Dr. Harju's testimony was devoted to various economic scenarios in which plaintiff's wages dropped to a much lower rate for skilled labor or plaintiff incurs the cost of college training. As shown above, this economic predicament is plaintiff's fate with or without his knee injury if he loses his present job.